Filed 6/11/14  P. v. Ysiano CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEONARD YSIANO, Jr.,<br><br>    Defendant and Appellant. | E053550<br><br>(Super.Ct.No. INF061442)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Ronald Johnson and Graham Anderson Cribbs, Judges.[1]  Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal for Defendant and Appellant.

---

[1] The Honorable Ronald Johnson (retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) presided over the first trial and the Honorable Graham Anderson Cribbs over the second trial.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Leonard Ysiano, Jr., of possession of a firearm by an ex-felon (Pen. Code, § 12021, subd. (a)(1))[2] following the first trial in this case, but hung on charges of murder (§ 187, subd. (a)) and attempted murder (§§ 664/187, subd. (a)). The first jury also found true the allegation that defendant had suffered a strike prior (§ 667, subds. (c) & (e)). During a second trial of the murder and attempted murder charges, a second jury convicted defendant of both crimes, the former of the first degree and the latter willfully and with premeditation and deliberation, and made true findings that he had discharged a firearm proximately causing death (§ 12022.53, subd. (d)) during the murder and discharged a firearm proximately causing great bodily injury (§ 12022.53, subd. (d)) and inflicted great bodily injury(§ 12022.7, subd. (a)) during the attempted murder. The second jury also found true the allegation that defendant had suffered a prior conviction for a serious felony. He was sentenced to prison for 50 years to life, two consecutive terms of 25 years to life, and a consecutive term of 14 years to life. He appeals, claiming a juror's request to be dismissed during the first trial should not have been granted and the prohibition on double jeopardy requires reversal of all his convictions and true findings, his conviction for possessing a firearm should be reversed

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

due to instructional error, and the trial court erroneously admitted evidence during the second trial, requiring reversal of the convictions and true findings made during it. We reject his contentions and affirm.

## FACTS

Facts adduced at the first trial related to defendant's conviction of being an ex-felon in possession of a firearm will be discussed elsewhere in this opinion. During the second trial, it was established that defendant had pled guilty to voluntary manslaughter in 1990, and the murder victim had identified him to police as the killer in that case. Defendant owned a white GMC Sierra pickup truck. During the afternoon of March 28, 2008, he was at a casino.

On the night of March 28, 2008, the murder victim and the attempted murder victim, who were brothers, parked their car in the driveway of their Coachella home. After they got out of their car, the attempted murder victim saw a man pull up in a white truck, get out and fire several shots at the murder victim, killing him. The gunman then fired several shots at the attempted murder victim, wounding him. The attempted murder victim told a responding police officer at the scene that defendant was the shooter. Also at the scene, he told another officer the same thing. Later that night at the hospital where the attempted murder victim had been taken for treatment, he picked defendant's picture out of a photographic lineup as the shooter. The attempted murder victim repeated his identification of defendant to a detective on March 31 and April 1, 2008, explaining that he had seen defendant earlier that day at a casino. However, the attempted murder victim

3

said on March 31 that he would not testify against defendant or he would get shot. He also said that defendant had a beef with the murder victim for the latter "[p]utting [defendant] away . . . [¶] . . . [¶] . . . a long time ago."

The attempted murder victim testified at the preliminary hearing that he remembered nothing about March 28, 2008. Thereafter, he went to Missouri where he was eventually arrested by two investigators from the District Attorney's Office and forcibly returned to Riverside County to testify as a material witness. One of the investigators recorded a conversation that they, the prosecutor during the first trial and the attempted murder victim had. In the conversation, the attempted murder victim said that he saw defendant shoot the murder victim and himself, but he would not testify to this because he was afraid for his life and the lives of those in his family. He also said that he lied at the preliminary hearing, and when he saw the defendant at the casino the afternoon before the shooting, defendant had asked him about the murder victim and the attempted murder victim told defendant that the former was at home.

At trial, the attempted murder victim said he did not remember anything about March 28, 2008, he had used methamphetamine that day, he did not know defendant, he did not remember anyone in California outside members of his family and he did not remember making statements to the police or people from the prosecutor's office implicating defendant in the shooting or asserting that he would not testify. He said he did not want to testify, he had been arrested in Missouri on a material witness warrant

4

and brought to court and he had been kept in jail. He said he did not think the person who shot him should be held accountable, adding, "His day will come."

A female who testified at trial had given three recorded interviews in which she said that she drove near the home of the victims on March 28, 2008, and was cut off by a white Chevy Silverado king cab truck. She said the driver of the truck got out and started shooting at the victims until he emptied his gun. Although she had known defendant all her life and identified him in a photographic lineup, she said she did not see the face of the shooter. However, when she tried to help the attempted murder victim at the scene, he told her that defendant was the shooter. At the preliminary hearing and at trial, she claimed to have no memory of the events of March 28th, 2008, saying she was drunk.

Defendant and his wife checked into a Palm Desert motel shortly before 11:00 p.m. on the night of the shooting, even though they lived nearby in La Quinta and the wife was not feeling well.

It was likely that the bullets that killed and injured the victims, .40 calibers, had been fired from a Glock semiautomatic handgun. Ammunition of that caliber was found in a bag in defendant's house with his name on it. Gunshot residue was found on defendant's right hand and the left side of his face following his arrest the morning after the shooting.

When interviewed that day, defendant initially said he had been home all day on March 28, 2008, except for a trip to the liquor store, then later, after being told that the police knew that he had been at the casino, he admitted he had been there and had spoken

5

to the attempted murder victim.  Defendant admitted that around the time of the crimes he had parked his truck some distance from his home, then ran home.  When defendant told his wife that the gun residue test that was done on him had come back positive, she asked him if he was out shooting.  He replied, "I . . . told [the police] I went to [Indio], shooting, a couple of days ago."  He clearly did not tell her once while meeting with her the day after the shooting that he had not committed the crimes,[3] even though he told her that the police had told him that witnesses had identified him as the shooter, he was obsessed with the idea that she would suffer as a result of his incarceration and she had asked him what she was going to tell people after the shooting was reported on the news.  At one point, he asked his wife what his best defense would be, so his sentence could be cut down to five or six years "or something."  He told her that they should not have stopped at the motel—they should have kept driving.  At the end of his interview, before he was taken away to be booked, defendant said, "This is hell.  I lost my wife.  I lost my life."

## ISSUES AND DISCUSSION

1. *Excusal of Juror During First Trial*

After opening statements had been made during the first trial, the trial court received a note from one of the jurors claiming a hardship in that if she did not make

---

[3]  At one point, he said, " . . . [T]hey got to prove it.  I ain't do anything."

6

herself available to look for work, she would lose her unemployment benefits.[4]  In a letter

to the court, this juror said that she had learned just the day before that because she was

on her first extension of benefits, her jury service might cause her to lose the maximum

benefit amount, which she could not afford.  In fact, the juror had asked to be excused.[5]

Defense counsel said that he learned via "hearsay" during a prior trial that unemployment

benefits were not supposed to be affected by jury service, except that the $15 each juror

is paid per day for jury service can be deducted from benefits.  The trial court commented

that counsel's understanding was "probably absolutely correct" but if counsel wanted to

force this juror to stay, when she clearly did not want to serve, that is something counsel

would have to do.  Although the prosecutor stipulated to having this juror excused,

defense counsel refused to do so, explaining that he and the prosecutor had spent a lot of

time picking the jury, he had waived 10 or more peremptories and was not sure he would

have done so had this particular juror not been on the jury and he chose this particular

juror to be on the jury, and he did not believe that she would suffer any adverse economic

---

**4**  The note stated, in pertinent part, "I . . . request excusal from jury service
effective today . . . .  After my selection to the jury I was informed of new information
that would seriously affect my financial situation.  [¶]  I . . . currently receive
unemployment benefits (first extension).  According to the Employment Development
Department any monies I receive as a juror will be counted as wages and my
unemployment benefit will be impacted.  Because I am on my first extension I may lose
it and not be eligible to continue receiving the maximum benefit amount.  [¶]  My
financial obligations not only extend to myself but to my elderly mother who relies on a
portion of my income.  Service on this jury will severely impact me financially and I
cannot afford to risk my unemployment income."

**5** See footnote 4, *ante.*

consequences if she remained on the jury. The trial court said if defense counsel wanted the former to force this juror to stay, it would, as it did not want to create another issue for appeal. However, the trial court said it felt it was "insanity" to leave a juror on the jury who didn't want to be there and was worried about her finances. The court feared that she would stop participating in the process, refuse to deliberate or make a decision that was not based on the law and the evidence. The court concluded that this was a risk that neither side should take and it excused the juror, based on her request. Defense counsel then moved for a mistrial, asserting that the excusal was not for proper cause. The trial court denied the motion, finding that in the juror's mind, she was going to be negatively impacted by having to serve on the jury and whether she actually was or not was immaterial, as her fears would be a source of distraction and possibly unfairness for her.

The parties here agree[6] that the trial court's decision that good cause exists to grant a juror's request to be excused is within the court's discretion and will be upheld on appeal if supported by substantial evidence, with the juror's inability to serve appearing in the record as a demonstrable reality. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1099; *People v. Boyette* (2002) 29 Cal.4th 381, 462.) The latter refers to "whether . . . the trial court actually did rely on" "evidence from which a reasonable trial court could have concluded dismissal was warranted" [as the basis for its decision.] [¶] . . . [T]he 'less

---

[6] See Appellant's Reply Brief, page 9; Respondent's Brief, pages 13-14.

deferential review' [citation] [applicable] to decisions to remove jurors . . . is that the record establish the actual basis for the trial court's decision. So long as it does, [appellate courts] ask only [whether] the evidence relied upon was sufficient to support that basis as grounds for dismissal; also [appellate courts] do not . . . demand more compelling proof than that which could satisfy a reasonable jurist." (*People v. Duff* (2014) 58 Cal.4th 527, 560.) "[A] hearing is not required in all circumstances. The [trial] court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry." (*People v. Beeler* (1995) 9 Cal.4th 953, 989.) " . . . [T]he Legislature has left the procedure for determining whether grounds for dismissal exist in the trial court's hands." (*People v. Duff*, *supra*, 58 Cal.4th at p. 560, fn. 15.)

It is all well and good for defendant now, at this late date, to cite the Unemployment Insurance Code in an effort to demonstrate to this court that this juror would not have suffered a diminution or an interruption in her unemployment benefits by serving on this jury. However, at the time she asked to be excused from duty, no one was willing to research the law (least of all, defense counsel, who was objecting to her excusal) or to make any guarantees to her that this would be the case. Even defense counsel couched his representation that her benefits would not be affected as follows, "*I was told—and only by hearsay*—that unemployment is not allowed to abbreviate [(whatever that means)] your benefits if you're chosen for jury service. . . . *I think* it's a fallacy that she would not get her unemployment check if she is not available [to look for

9

a job because she is serving on a jury], but she is correct that she would have a deduction of what she gets for jury service." What this juror needed was some concrete assurance that her benefits would not be interrupted. Defense counsel offered no such assurance. Does defendant now propose that the trial court hold up trial while someone researched the Unemployment Code or sought a "ruling" the from Employment Development Department (EDD) about this juror's benefits? That's asking far too much of the trial court. We note that defense counsel did not even ask for a short recess so the matter could be researched. Moreover, although, as defendant *now* points out, the Unemployment Insurance Code provides that a person is eligible to receive benefits even though he or she is serving on a jury, what is there to stop some bureaucrat at EDD from delaying or withholding benefits from an applicant such as this juror who reports that she is not available for work or has not been seeking employment during a particular week, both as required by Unemployment Insurance Code section 1253, subdivisions (c) and (e), because of jury duty? What this juror was seeking was reassurance that her benefits would not be affected. She didn't get that reassurance. As such, the trial court feared that she would not discharge her duties as a juror and the court granted her request that she be excused. In our view, the trial court did not abuse its discretion in so doing. (See *People v. Montes* (2014) 58 Cal.4th 809, 872.)

In *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1854, 1855, 1856, the appellate court concluded that the employment problem cited by the trial court as a reason for excusing two jurors was not a demonstrable reality because the latter had

neither asked the trial court to be excused, nor had they been asked whether if their employers did not pay for another day during which the jury deliberated, they would be willing to stay. The mistake in *Delamora* was on the part of the trial court—not on the part of the excused jurors—in its assumption that the jurors would not want to serve another day if their employers would not compensate them for that day. In contrast, here, *the juror* asked to be excused and although she did not expressly state that any affect her jury service would have on her unemployment benefits would impact her ability to serve, the trial court reasonably concluded that this was the case based on her representation that "[s]ervice on the jury will severely impact me financially[.]"

Defendant criticizes the trial court for failing to allay the juror's concerns, but the court had no basis for doing so, as already discussed. Defendant also calls the trial court to task for not calling the juror in for a hearing. However, short of being able to assure her that her benefits would not be affected, there was nothing the trial court could say to her to allay her concerns, which were well stated in her letter to the court, thus eliminating any need for a further hearing.

Additionally, defendant fails to carry his heavy burden of demonstrating that he was harmed by the substitution of an alternate juror for this juror. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1486.)[7] Although defendant contends that the excused

---

[7] We agree with the People that defendant's reliance on *People v. Hernandez* (2003) 30 Cal.4th 1 (*Hernandez*), for the proposition that the excusal of a defense-favorable juror sufficiently demonstrates prejudice is misplaced. In *Hernandez*, t*he Supreme Court accepted the conclusion of the Court of Appeal in that case that the*

*[footnote continued on next page]*

11

juror was what he calls "defense-favorable," his assertion is based merely on the fact that he objected to her excusal, and in so doing, he said that he had specifically picked her for the jury. However, this falls far short of defendant's burden of showing prejudice. Defense counsel may have *hoped* that this juror would be favorable to defendant and therefore, picked her for the jury, and objected when the prospect of excusing her loomed large, but it was mere speculation on counsel's part that substituting an alternate juror that he failed to excuse by the use of a peremptory put defendant in a worse position then leaving this juror on the panel.

Having concluded that the trial court did not err in dismissing this juror, we necessarily reject defendant's contention that his conviction at the end of this first trial, of possessing a firearm, should be reversed and his motion, at the end of the first trial, to bar his retrial for the murder and attempted murder due to double jeopardy should have been granted.[8]

---

*[footnote continued from previous page]*
*excusal of the juror constituted prejudicial error.* (*Id*. at pp. 3-4.) The only issue *Hernandez* addressed was whether double jeopardy barred retrial. (*Ibid*.) Moreover, as we have already concluded, defendant failed to carry his burden of showing that this juror was "defense-favorable."

[8] As to the latter, defendant concedes that in *Hernandez, supra*, 30 Cal. 4th 1, the California Supreme Court held that the improper discharge of a juror does not bar retrial on double jeopardy principals and this court is bound by that holding under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455).

2. *Defendant's Conviction for Being an Ex-Felon in Possession of a Firearm*

While on the stand at the first trial, defendant testified that two days before he was arrested, the day after the murder and attempted murder, he ran into people who were target shooting in Indio and he fired their gun. This evidence was introduced to explain why defendant had gunshot residue on his hands soon after the charged murder and attempted murder. He claimed he did not know that as an ex-felon he could not *shoot* a gun—only that he could not *possess* or *own* one, although his attorney subsequently told him otherwise. The trial court told defendant that he could not testify as to what his attorney had told him. Defendant also asserted that he believed that after 10 years subsequent to being convicted of his prior offense, he could actually or constructively possess a gun. Finally, he said he was not certain whether firing a gun was illegal.

The jury was instructed that the People had presented evidence of more than one act to prove the charged possession of a firearm by an ex-felon. The jury was also instructed, "If you find that defendant possessed a firearm, knew that he possessed a firearm, and had previously been convicted of a felony, then regardless of what he reasonably believes, the defendant is deemed to know under the law that he is a convicted felon forbidden to possess a firearm. Any asserted mistake by the defendant regarding his correct legal status does not constitute a defense to . . . possession of a firearm by a person prohibited due to a conviction."

The People argued to the jury that the evidence showed three instances during which defendant was a convicted felon in possession of a gun. The most obvious, the

13

prosecutor said, was at the scene of the murder and attempted murder. Another, which the prosecutor deemed to be a lie, but nevertheless was an admission that he had a gun and was out firing, was defendant's testimony that two days before the murder and attempted murder, he was out shooting with two others in Indio. Another was based on photos taken about a month before the murder and attempted murder, which depict defendant holding a gun. The prosecutor said of the second basis, i.e., the fact that defendant fired another person's gun, "The defendant took the stand and said, 'I didn't know,' which was great because as I talked to him further he [said], 'I did know but I though it expired in ten years. I thought I could not have a gun but I could shoot one.'" The prosecutor went on to call the jury's attention to the instruction quoted above.

During argument to the jury, defense counsel said, "[Defendant] told you what happened. . . . He ran into those guys in [Indio]. He was shooting their weapon. He had this misunderstanding that he didn't think he could own or have one of his own [firearms] in his house, but he thought he could shoot someone else's [firearm]. And the judge stopped him from explaining [the] explanation [I had given] to him. The [prosecutor] is right. You can't even fire a weapon, if you're a felon. That's true. I'm not arguing that. It's not what this case is really about, is it? What [defendant] is charged with is murdering one person and attempting to murder another person and fired a weapon to do so." Counsel went on to argue that defendant's possession of a firearm based on the photo could not serve as a basis for the conviction because the only evidence adduced at trial concerning it was that it occurred in Arizona. Defense counsel continued, "If this

14

case is about shooting off someone else's gun in [Indio]—and he shouldn't have done it—so be it. I will not argue about that. We are talking about murder and attempted murder . . . ." Counsel went on to argue that defendant was not guilty of murder or attempted murder, although he ultimately asked for "a verdict of not guilty."

In her rebuttal argument, the prosecutor asked the jury to convict defendant of murder and attempted murder.

Defendant here contends that his conviction for possessing a firearm should be reversed because the jury could have based it on the photograph showing that he possessed a gun outside the state of California.[9] However, because defendant conceded that he was guilty of the charged possession, there was a valid basis for the verdict. (See

---

[9] We reject the People's argument that this was not an incorrect theory because evidence that defendant possessed ammunition in California could have served as a basis for a conclusion that defendant "made arrangements to shoot and possess the firearms depicted in [the picture] while still in California." Unfortunately for the People, this theory is contrary to what the jury was told by the prosecutor, which was that the crime occurred when defendant possessed the gun as depicted in the picture. The argument that broke out between the prosecutor, defense counsel and the trial court in the presence of the jury was whether if defendant possessed the gun in Arizona, it could still serve as a basis for the conviction, with the trial court stating its opinion that defendant did not have to be in Riverside County when the possession occurred, and when defense counsel pointed out that the information charged that the possession occurred in that county, the trial court said only that it was up to the jury to decide if the crime had been committed. Therefore, had defense counsel not conceded that defendant was guilty of the possession based on his own testimony about shooting his friends' gun in Indio, we would be compelled to conclude that members of the jury could have convicted defendant based on his possession of the gun as depicted in the photograph, i.e., in Arizona, which was a legally incorrect theory, absent instructions that they could find guilt based on his antecedent acts in California, which they did not receive.

15

*People v. Chun* (2009) 45 Cal.4th 1172, 1205; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129, 1130.)

3. *Admission of Witness's Prior Statement*

In arguing that the trial court at the second trial erred in permitting the prosecution to introduce a pretrial recorded statement by the attempted murder victim, therefore, his conviction of murder and attempted murder should be reversed, defendant calls our attention to arguments made by counsel and rulings made by the trial court concerning this statement before the first trial, but he does not mention the arguments and ruling made before the second trial, which are the ones that are relevant to the admission of this statement at the second trial. In arguing that the trial court who conducted the second trial erred in admitting this statement, defendant here relies, in part, on a factual assumption made by the trial court that ruled on the admissibility of this statement before the first trial.[10] This we will not do.[11]

According to the People's response to defendant's moving papers before the second trial, the attempted murder victim had expressed an unwillingness to testify since the night of the crimes, due to his fear of defendant and defendant's family. Despite his

---

[10] Specifically, that assumption was that the attempted murder victim would testify that he expected his statement to be confidential.

[11] In his reply brief, defendant cites Reporter's Transcript pages 2309-2310 and 2466-2467 in support of his assertion that the second trial court accepted the first trial court's assumption that the attempted murder victim would say that he expected his statement to be confidential. Those pages do not support his assertion.

16

fear, however, the attempted murder victim maintained that defendant had shot him and the murder victim. The attempted murder victim feigned memory loss during the preliminary hearing. In February 2011, before the first trial began, the attempted murder victim was arrested in Missouri on a material witness (in this case) warrant and brought to California. He was taken by two investigators from the District Attorney's office from jail to a room at that office across from the investigators' offices. In his moving papers before the second trial, defendant stated that the deputy district attorney who tried this case the first time and the two investigators questioned the attempted murder victim and he said he did not want to testify at trial and if called, he would lie. The deputy district attorney and the investigators then stepped out into the hall and activated a pocket recorder and resumed the interview, during which the attempted murder victim reiterated that he could not testify, and that it was defendant who shot him and the murder victim.

In those moving papers, defendant asserted, in pertinent part, that this statement was involuntary and illegally obtained because the attempted murder victim was not informed that it was being recorded and he did not consent to its recording. Defendant asserted that section 632, subdivision (a) prohibited the surreptitious recording of confidential communications and prohibited the admission of that recording in any judicial proceeding. Defendant argued that because the attempted murder victim had repeatedly stated that he did not want to testify due to his fear of defendant and defendant's family, he "clearly did not want his statements to be made public."

17

In their response to defendant's moving papers, the People pointed out that section 632, subdivision (a) applies only to confidential communications, which are communications carried out in circumstances that may reasonably indicate that any party to the communication desires it to be confined to the parties. They asserted that because the attempted murder victim remained in custody and spoke to investigators and the deputy district attorney who had been assigned to prosecute the case, the circumstances did not reasonably indicate that what he said would be confidential. The People added that they could locate no authority that law enforcement is not allowed to record witness interviews, or that a witness must consent to recording a police interview. During the hearing on the matter, the People cited *People v. Wyrick* (1978) 77 Cal.App.3d 903, that whether a communication is confidential depends on the reasonable expectations of the parties judged by an objective and not a subjective standard.

The trial court ruled that the statement was admissible.[12] Defendant contests this ruling, but fails to persuade us that the attempted murder victim had a reasonable expectation that his statement would be confidential when questioned by no less than

---

[12] We disagree with the People that the trial court did not rule on this matter. The People clearly argued the confidentiality issue at the hearing before the trial court. The trial court put off ruling on the admissibility of the statement, but then ruled that it was admissible. Although there were other objections to the admissibility of this statement, we deem the trial court's ruling a rejection of all of them.

18

three people from the prosecution team, while he was in custody.[13]  As the parties agree, the attempted murder victim had to have had an objectively reasonable expectation that his statement was not being overheard or recorded.  (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 768.)  Moreover, as the People correctly assert, had the tape not been admitted, there was nothing preventing the prosecutor from calling the two investigators to testify to what the attempted murder victim had said to them and the prosecutor.  Finally, the attempted murder victim identified defendant as the shooter so many times, expressed his fear of retaliation by defendant and was impeached by his convenient lack of memory that we are persuaded that if the trial court erred in admitting this particular statement, in addition to all the other evidence proving defendant's guilt, there is no reasonable probability that the outcome of this case would have been any different.  (See *People v. Nakai* (2101) 183 Cal.App.4th 499, 519.)

---

[13]  Even if we accepted the prior trial court's assumption that the attempted murder victim actually believed that this statement would be confidential (see fn. 10, *ante*, p. 16), his belief must be reasonable under the circumstances.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

RICHLI

J.

KING

J.

20