[No. B095821. Second Dist., Div. One. Aug. 15, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
SALVADOR DELAMORA, Defendant and Appellant.

COUNSEL

Jeffrey Liebowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin and Lori R. Mars, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**VOGEL (Miriam A.), J.**—Salvador Delamora appeals following his conviction of one count of attempted robbery, contending the trial court improperly discharged two jurors during deliberations. We reverse.

BACKGROUND

David Victor was approached by two men (later identified as Delamora and Denis Hernandez) who asked for money. When Victor said he had none, Hernandez grabbed him and held him while Delamora tried to reach into his pockets. Victor yelled for help and was heard by a passing police officer who saw him trying to break away from two assailants. Delamora and Hernandez ran away when the officer approached, but they were caught by other officers, arrested, and charged with one count of attempted robbery.[1]

Delamora and Hernandez were tried together. Voir dire began on Monday, July 24, 1995, at which time the trial court told the prospective jurors that the trial would probably conclude on Tuesday or Wednesday of the following week and asked whether that posed a problem for anyone. Elizaveta Mkhitarian answered affirmatively, explaining that she had completed five days of jury service and would be paid by her employer for only ten days. Cecilia Camacho-Shapiro also responded affirmatively, explaining that she was in the same position—she would be paid only for ten days and was in the middle of her fifth day.

The trial court nevertheless refused to excuse them and told them, in essence, that he would "encourage" their employers to pay them if need be:

---

[1]Hernandez is not a party to this appeal. At trial, Delamora testified that Hernandez had approached Victor alone and that he (Delamora) had simply followed Hernandez (Delamora thought he was drunk) to try to get him back to their car, where Delamora's friend, Maria Cartagena, was waiting. Cartagena confirmed Delamora's version of the events.

"If you are selected [for] the jury . . . , we will have . . . two alternates to protect against th[e] possibility that someone would have to leave. And in the unlikely event that we are still not through with the case, if it is a question of your employer and you are going to run a day or two days over what you are paid for, I . . . will [call] a supervisor. . . . And anyone who ends up in the jury box and runs out of paid time—as I say, it is not likely to be more than a day or two over. And I will do my very best to see that . . . your employer agrees to compensate you for that time. And then I will ask that you hang in there and bear with us."

Mkhitarian and Camacho-Shapiro were selected as jurors. On Tuesday, July 25, the People presented their case. On Wednesday, July 26, Delamora presented his defense (Hernandez had no defense). On Thursday, July 27, all sides rested, closing arguments were presented, and the jury was instructed. The jury deliberated for about two hours that afternoon, all day Friday (July 28), and more than half the day on Monday (July 31). At about 2:30 p.m. on Monday, the jury sent the court a note: "We agree on a verdict for one defendant, however we cannot for the second—Count I—find a verdict." (There was only one count charged against each defendant, but the jury was instructed on the lesser included offenses of theft by larceny, grand theft, petty theft, and battery.)[2]

The jury was brought into the courtroom, and a verdict was taken as to Hernandez (he was convicted as charged). The court then inquired about the jury's deliberations with regard to Delamora: "[W]ithout telling me the way the vote is inclining with respect to Mr. Delamora, can you tell me how you are divided at this point? How many on one side and how many on the other?" The foreman answered, *I believe it was either 9-3 or 10-2.* (Italics added.) When asked how many ballots they had taken, the foreman said he thought it was three. When asked if "some further deliberation might help" them reach a verdict, the foreman said what they were "looking for was further information." The court encouraged them to continue their deliberations, and explained that testimony could be read back to them if that was what they meant by "further information." The court suggested they return to the jury room to discuss whether further deliberations would be helpful.

At about 2:45 p.m., the jury retired and apparently decided that further deliberations were in order—they remained in the jury room until they left

---

[2]There are two notes in the clerk's transcript, but the only one discussed in the reporter's transcript is the one quoted in the text. The other note asked, "If we are deadlocked on the first charge can we consider the lesser charges[?]" By a handwritten note on the same form, the court responded, "Please carefully review instruction 17.12." The jury answered, "We will deliberate a little longer." Although we can't be sure, it sounds as though this note preceded the one in which the court was told that a verdict had been reached as to one defendant.

for the day at about 4:10 p.m. On Tuesday, August 1, the jury resumed its deliberations at 8:55 a.m. and, with a break for lunch, deliberated until about 2:00 p.m., at which time they asked for a read-back of the testimony of Delamora, his friend Cartagena, and the officer who responded to the victim's yell. At about 3:40 p.m., the jury resumed its deliberations. Shortly thereafter, the court was advised there was a "need for another day of deliberation" and that Jurors Mkhitarian and Camacho-Shapiro wanted the court's "help in getting extra compensated time off[, that] they would like to have another day of time off." They did *not* ask to be excused if they would not be paid, nor did they say anything to suggest they wanted to be excused.

Although it is not reflected in the record, the trial court's comments to counsel in response to this request show the court had earlier contacted the jurors' employers and obtained an extra day of compensated time for each of them: "Unfortunately, I told both of their employers, showing how wrong one can be in prophes[ying] these things, that I thought there was every likelihood they would have their people back tomorrow [Wednesday, August 2]. And, I really don't want to go back and twist their arms anymore. [¶] So what I'm inclined to do, if they don't reach a verdict today, is to excuse the two jurors who appear to be the only ones that have a problem with the hardship if they continue on the jury, and use our two alternates." Defense counsel objected, arguing that the jury was close to a verdict and that, in any event, the two jurors had not requested that they be discharged. The court did not respond.

At about 4:00 p.m., the jury was brought into the courtroom, at which time the court stated: "[The bailiff] indicates that the jury feels it may not complete its task today, and that two jurors whose employers I have called on their behalf were inquiring about whether I would go back to the employers to seek an additional day of compensation. Frankly, I am reluctant to do that, wisely or unwisely. I committed to your employers that I thought you would conclude your service today. . . . And while I would be delighted if you could get in another hour or so of deliberations today and perhaps reach a verdict, I don't know. If you are unable to reach a verdict today, my intention is to excuse Ms. Mkhitarian and Ms. Camacho-Shapiro and substitute the alternates into the jury as we proceed tomorrow. So I will allow you to negotiate with [the bailiff] as to what hour to which you will continue deliberating today. And then if you don't reach a verdict today, I think without any further appearance here in front of me I will just tell those two jurors I have named thanks in advance. You need not report back here today. And we will need the two alternates tomorrow to take those places, if that is what occurs." The jurors returned to the jury room.

Defense counsel expressed surprise at the manner in which the trial court had presented the matter to the jury: "I didn't realize the court was going to

say it the way the court did. I am concerned that maybe the court is forcing a verdict on somebody who may not have realized and may switch a vote or something because of the court indicating that changes were going to be made. So I would have an objection to the way the court handled it." Within a few minutes, the court was advised that the jury could not reach a verdict that day. Jurors Mkhitarian and Camacho-Shapiro were discharged, alternates were substituted in their place, the jury was instructed to begin deliberations anew, and the jury was excused for the day.

The reconstituted jury deliberated for about three hours on Wednesday morning, had lunch, then returned its verdict finding Delamora guilty as charged. Delamora appeals.

## DISCUSSION

Twelve jurors deliberated for about three and one-half days, with two (or possibly three) holdouts. When two jurors were replaced without any inquiry about whether they would be willing to remain another day even if their employers would not pay them, the reconstituted jury reached a verdict in about three hours. Based on these facts, Delamora contends it was prejudicial error to excuse the two jurors. We agree.

Penal Code section 1089 permits the trial court to discharge a juror when (1) a juror becomes ill, or (2) upon other good cause shown to the court, a juror is found to be unable to perform his duty, or (3) if a juror requests a discharge and good cause appears therefor. Mkhitarian and Camacho-Shapiro were not ill. They were not unable to perform their duties. They did not ask to be excused. The most that can be said is that they asked the trial court to call their employers to request an additional day's compensation, but there is nothing in the record (either during voir dire or during deliberations) to suggest that either of them was unwilling or unable to continue if they had to serve another day or two without pay. The question before us, therefore, is whether the trial court's decision to discharge them constitutes an abuse of discretion. (*People v. Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].)

Although a trial court does not abuse its discretion when it discharges a juror because of problems related to the juror's employment, the employment problem must be real and not imagined. In *People v. Fudge* (1994) 7 Cal.4th 1075, 1098-1100 [31 Cal.Rptr.2d 321, 875 P.2d 36], the Supreme Court found good cause for the discharge of a juror who had talked to her employer by telephone and then informed the trial court that her

"anxiety" over work she had to complete would affect her ability to deliberate. On that record, there was substantial evidence to support the good cause finding. (*Id.* at p. 1100.) In *People* v. *Thomas* (1990) 218 Cal.App.3d 1477, 1483-1485 [267 Cal.Rptr. 865], Division Two of our court found good cause for the discharge of a juror who had informed the court that he had exceeded the number of days allowed by his employer for jury duty and that "he risked losing his job" if he continued to serve.[3]

We are not suggesting that a formal hearing must be held to determine good cause. Clearly, it is up to the trial court to determine the appropriate procedure to follow when a question arises about a juror's continued service. (*People* v. *Beeler, supra,* 9 Cal.4th at p. 989.) ■■■ As noted above, however, the trial court's determination that good cause exists to discharge a juror must be supported by substantial evidence (*People* v. *Fudge, supra,* 7 Cal.4th at p. 1100) and where, as here, there is no evidence at all to show good cause (because no inquiry of any kind was made), the procedure used was by definition inadequate. (*People* v. *Green* (1995) 31 Cal.App.4th 1001, 1011-1012 [38 Cal.Rptr.2d 401] [the reason for the juror's inability to continue "must appear in the record as a demonstrable reality"].)

And although it is true that where an alternate juror, approved by the defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed (*People* v. *Thomas, supra,* 218 Cal.App.3d at p. 1486), the record in this case shows such harm. Before Jurors Mkhitarian and Camacho-Shapiro were discharged, the jury was divided 10 to 2 or 9 to 3, and the jurors had clearly anguished over the question of Delamora's guilt for three days. Within three hours after Jurors Mkhitarian and Camacho-Shapiro were replaced with two alternates (much of which time must have been spent bringing them up to speed), the jury returned a verdict of guilt. Thus, while we do not know for a fact that Jurors Mkhitarian and Camacho-Shapiro were the holdouts, the record strongly suggests they were. In our view, the requisite harm has thus been shown.

---

[3] The flip side of the coin is equally true. Notwithstanding an employer's refusal to compensate a juror for extended jury service, and notwithstanding the juror's representation to the court that continued service without pay would cause a hardship, the court's *refusal to excuse* the juror is proper when the juror represents to the court that he can continue to be fair and impartial and that he will not rush to any kind of decision. (*People* v. *Turner* (1994) 8 Cal.4th 137, 203-205 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Thus, had the trial court inquired of Jurors Mkhitarian and Camacho-Shapiro whether they could continue to deliberate in a fair and impartial manner, without rushing, even if their employers refused to pay them, and had they answered affirmatively, the trial court could (and probably should) have kept them on the jury.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial.

Spencer, P. J., and Masterson, J., concurred.

Respondent's petition for review by the Supreme Court was denied December 18, 1996.