Filed 3/9/17

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SIX

| SAMUEL SHANKS et al., | 2d Civ. B268459 |
|---|---|
| Plaintiffs and Respondents, | (Super. Ct. No. 56-2012-00423044-CU-PO-VTA) |
| v. | (Ventura County) |
| DEPARTMENT OF TRANSPORTATION, | |
| Defendant and Appellant. | |

Gary Lynn Shanks died in a head-on collision with another motorcycle on a state highway. In the ensuing wrongful death action, a jury determined that the People of the State of California (State) and the operator of the other motorcycle were at fault. The jury found the State liable for a dangerous condition on the highway and awarded Shanks's family a total of $12,690,000 in damages. After just 90 minutes of deliberation, however, Juror No. 2 reported that Juror No. 7 was not deliberating. The trial court confirmed this by questioning that juror and a second juror who had "raised concerns" about Juror No. 7. The court thereafter excused Juror No. 7 and seated an

alternate. It made no inquiry of the accused juror or of any of the remaining jurors, including the foreperson.

We conclude the record does not show as a "demonstrable reality" that Juror No. 7 failed to deliberate or was otherwise unable to perform her duty. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474-475 (*Cleveland*); *Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640, 1686 (*Boeken*).) The trial court consequently abused its discretion by discharging her. This error was prejudicial in that the jury's apportionment of liability between the State and the other defendant was by a nine-to-three vote, and Juror No. 7 had expressed her inclination to vote for the State. (*People v. Hamilton* (1963) 60 Cal.2d 105, 128 (*Hamilton*), overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649, and disapproved on other grounds in *People v. Daniels* (1991) 52 Cal.3d 815, 865-866.) Accordingly, we remand the matter to the trial court for a retrial of the apportionment issue. In all other respects, we affirm.

FACTS AND PROCEDURAL HISTORY

State Highway 33 is a two-lane, north-south road, with a posted speed limit of 55 miles per hour. The accident involving Shanks and the other motorcyclist, Orlando Castellon, occurred on a sharp, blind curve. The State had installed a warning sign for northbound motorists informing them to reduce speed to 25 miles per hour to safely negotiate the curve, but there was no such sign for southbound motorists. As a result, Castellon, who was traveling southbound, failed to reduce his speed and lost control of his motorcycle as he rounded the curve. He crossed over the center line and struck Shanks head-on. Shanks died at the scene.

Shanks is survived by his wife, Patricia, an adult son, Samuel, and two minor children. His wife and adult son (collectively "respondents") filed this wrongful death action individually and on behalf of the minor children.

After presenting his closing argument, respondents' counsel, Arash Homampour, moved to discharge Juror No. 7 for sleeping as he argued. The State's counsel, Timothy Day, did not believe the juror was sleeping. Day thought that "[Juror No. 7] looked annoyed and frustrated at the arguments being made by [respondents'] counsel, and she rolled her eyes, and she went like this a few times, closing her eyes with her hands on her eyebrows."

Homampour's co-counsel, Farzad Yassini, also told the trial court that Juror No. 7's eyes were closed during respondents' opening and rebuttal arguments and that "[i]t looked to [him] like she was sleeping." In addition, the court reporter sent the trial judge a note via the "realtime" system stating that the juror was sleeping.

The trial court, which had an obstructed view of the juror, could not make a finding that Juror No. 7 was actually sleeping, as opposed to listening to the argument with her eyes closed. Consequently, the court declined to discharge the juror.

The jury deliberated for about 90 minutes before being excused for the day. The following day Juror No. 2 called the trial court to inform it that one of the other jurors was not adequately deliberating. After discussing the issue with the parties, the court determined there was a sufficient basis to inquire into Juror No. 2's complaint about the other juror. Before making its inquiry, the court stated that it planned on asking questions similar to those set forth in *Cleveland*, *supra*,

3

25 Cal.4th 466, and then specifically outlined the "leading" questions it planned to ask. The State's counsel said he thought the court should delay the inquiry to allow for more deliberations but did not object to the questions or suggest different ones.

Prior to questioning Juror No. 2, the trial court told the juror that it was "absolutely critical" that "[w]e can't know how any jurors are voting." The court explained to the juror that it did not want her to disclose "which way you are leaning" or "how any other jurors are leaning." The court stated, "I'm going to ask you a lot of leading questions, yes-or-no questions to try and steer clear of you telling me anything about what you or other members of the jury think about the case."

In response to the trial court's questions, Juror No. 2 identified Juror No. 7 as the juror who had "expressed a fixed conclusion [about the outcome of the case] at the beginning of deliberations." When the court asked whether Juror No. 7 had listened to the views of other jurors, Juror No. 2 responded, "Can I say not well?" The court inquired, "And by 'not well,' do you mean in terms of her giving feedback?" The juror said, "Yes. Just very adamant." The juror also identified Juror No. 1 as another juror who had "raised concerns" about Juror No. 7.

After conferring with counsel, the trial court asked Juror No. 2 if it was her opinion that Juror No. 7 had prejudged the case "at the outset of jury deliberations." The juror responded, "Yes."

Respondents' counsel requested that the trial court bring in Juror No. 1. The court asked if the "defense [was] opposed," and the State's counsel responded "No," although he thought it would be "better" to bring in the foreperson to "tell us what his or her understanding of the interactions are." The court

4

indicated it may do that, but decided to "speak with Juror No. 1 at this time."

The trial court asked Juror No. 1 if "there [is] a member of the jury who made up his or her mind at the very beginning of deliberations." Juror No. 1 responded, "Yes." He told the court that the juror's opinion had been stated as soon as deliberations began, and that he believed that "this juror had prejudged the case." Juror No. 1 identified the juror as Juror No. 7.

After Juror No. 1 left the courtroom, the trial court asked the parties whether they were requesting that the court "engage in any additional investigation." Respondents' counsel said "[n]ot from plaintiffs" and requested that the court "excuse Juror 7 and replace her with an alternate." The State's counsel responded: "We believe that we should be speaking with the foreperson to understand what the overall jury feeling is as the person in charge of the panel."

The trial court granted the request to discharge Juror No. 7 without conducting any additional inquiry. The court stated: "I do note for the record, less than a week ago, the California Supreme Court decided on August 24th, *People versus Williams* [(2015) 61 Cal.4th 1244], which is a case that addressed juror misconduct for sleeping during trial, and it raised my concerns in isolation. At the time, I didn't think it rose to the level of good cause, but combined with the comments of . . . Juror No. 2, and . . . Juror No. 1, I think the Court now has good cause and needs to discharge Juror No. 7. It all dove-tails together. You know, she was not paying attention during plaintiffs' closing. The jurors don't know that we had a concern about that. These two jurors have no way of knowing that we, the Court, counsel

was concerned about whether Juror No. 7 was paying attention. And right out of the [chute], they have a concern with Juror No. 7 paying attention and participating in jury [deliberations]. I just don't think that's a coincidence. I just don't. I think . . . we have crossed the threshold where now there is good cause to discharge Juror No. 7. I think it would be error and abuse of discretion for the Court to not do so."

As for conducting a further investigation, the trial court noted: "I [have] read the cases. I asked the very limited questions I think were appropriate. I've given my reasons for not opening up Pandora's box and marching every juror in here, including the foreperson. Again, the case law tells me to be as limited as I can and, at the same time, do enough of an investigation to resolve the matter, and the Court believes that it's done so." The court further stated: "And for the benefit of any higher court, you know, I would hope a higher court would be mindful of the fact that, sure, we could march in every other juror, including the foreperson and conduct an autopsy on this case and, you know, mistry it, and interfere with jury deliberations in a way that I do not think would comport with justice."

The trial court replaced Juror No. 7 with an alternate and instructed the jury to begin its deliberations anew. The jury reached a verdict in favor of respondents that same day. It unanimously found that the State's highway was in a dangerous condition at the time of the accident, that the State was on notice of the dangerous condition, and that the dangerous condition was a substantial factor in causing harm to respondents. The jury unanimously awarded Patricia Shanks total damages of $6 million. The $8.1 million damage award to the children was by

6

an eleven-to-one vote. The jury unanimously found that Castellon was negligent, and by a nine-to-three vote allocated 90 percent of the fault to the State and 10 percent to Castellon. The verdict against the State totaled $12,690,000.

The State moved for a new trial. It submitted a declaration from Juror No. 7 in which she stated she was not sleeping during respondents' closing argument. She declared: "I had my eyes closed and was listening to Mr. Homampour's closing argument. I closed my eyes briefly because I was not feeling well. I listened to all statements by Mr. Homampour while my eyes were closed, and I never was asleep. I listened to the entirety of the closing argument as well as the entirety of the closing argument for the State. I also listened to all evidence presented during the case."

Juror No. 7 also said her alleged unwillingness to deliberate was "not true." She stated: "I had an opinion going into deliberations, which was that the [S]tate was not liable, but had not made up my mind. I never expressed an unwillingness to deliberate, discuss or consider the evidence of the case."

Juror No. 7 noted that after the jurors had retired for deliberations, they had taken a preliminary vote: "3 for [the State], 1-2 undecided, and 6-7 for the plaintiffs." Juror Nos. 1 and 2 voted against the State, while Juror No. 7 voted for the State. During the course of the trial, Juror No. 7 discovered that Juror Nos. 1 and 2 "were carpooling to the trial every day, and had become very friendly." Juror No. 7 was "appalled to think that a juror could get another juror dismissed because they had opposing views."

The trial court denied the State's new trial motion. It found that the discharge of Juror No. 7 was proper and that the

7

State did not meet its burden of showing that Juror Nos. 1 and 2 were biased against Juror No. 7.  The State appeals.

DISCUSSION

*A.  Standard of Review*

The California Constitution guarantees the right to a jury trial in both civil and criminal cases.  (*Salisbury v. County of Orange* (2005) 131 Cal.App.4th 756, 764.)  Pursuant to article I, section 16 of the California Constitution, trial by jury is "'an inviolate right,'" "'a basic and fundamental part of our system of jurisprudence. . . .  As such, it should be zealously guarded by the courts . . . ."  (*Cohill v. Nationwide Auto Service* (1993) 16 Cal.App.4th 696, 699; see *Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 322 ["civil litigants are no less entitled to a fair trial than criminal defendants"].)  Consequently, the standards governing excusal of jurors during trial are common to both criminal and civil cases.  (Code Civ. Proc., § 233; Pen. Code § 1089[1]; see *Cleveland*, *supra*, 25 Cal.4th at pp. 474-475; *Boeken*, *supra*, 127 Cal.App.4th at p. 1686.)

---

[1] Code of Civil Procedure section 233 states:  "If, before the jury has returned its verdict to the court, a juror becomes sick or, upon other good cause shown to the court, is found to be unable to perform his or her duty, the court may order the juror to be discharged.  If any alternate jurors have been selected as provided by law, one of them shall then be designated by the court to take the place of the juror so discharged."  Penal Code section 1089 similarly provides:  "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the

A trial court has authority to discharge a juror upon good cause shown to the court that the juror is unable to perform his or her duty.  (Code Civ. Proc., § 233; Pen. Code § 1089.)  An appellate court reviews such a determination for abuse of discretion.  (*People v. Marshall* (1996) 13 Cal.4th 799, 843; *Boeken, supra,* 127 Cal.App.4th at p. 1686.)  This discretion, however, is not unfettered.  (*People v. Roberts* (1992) 2 Cal.4th 271, 325.)  Although the trial court's ruling will be upheld if there is substantial evidence to support it, the juror's inability to perform as a juror must "'"appear in the record as a demonstrable reality.'" [Citation.]"  (*Marshall*, at p. 843; *Boeken*, at p. 1686.)

The "demonstrable reality" standard requires a higher level of scrutiny than the typical "substantial evidence" review.  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)  This standard protects the parties' fundamental rights to due process and to a fair trial by an unbiased jury.  (*Ibid.*)  To affirm the discharge of a juror, the appellate court reviews the entire record to determine if the trial court actually relied on evidence that supported a conclusion that bias was established.  (*Id.* at pp. 1052-1053.)  The reviewing panel does not reweigh the evidence, but "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied."  (*Id.* at p. 1053.)

B.  *Alleged Failure to Object to Juror No. 7's Discharge*

Respondents contend the State failed to object to the discharge of Juror No. 7 and, as a consequence, failed to preserve the issue for appeal.  (See *People v. Ashmus* (1991) 54 Cal.3d 932, 987, fn. 16.)  We disagree.

---

same rules and regulations as though the alternate juror had been selected as one of the original jurors."

The State advised the trial court that it opposed the court's decision to interview only Juror Nos. 1 and 2 in deciding whether to discharge Juror No. 7. After the court finished questioning Juror No. 1, the court asked counsel if it should "engage in any additional investigation." The State's counsel restated his belief that "we should be speaking with the foreperson to understand what the overall jury feeling is as the person in charge of the panel." The court declined to interview the foreperson, but the State, by requesting an additional investigation, preserved the issue for review.

Moreover, it is well established that a party need not lodge a formal objection when doing so would be futile. (See *People v. Arias* (1996) 13 Cal.4th 92, 159; *People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1433, fn. 1; *Burch v. Gombos* (2000) 82 Cal.App.4th 352, 357.) When the trial court refused the State's request to interview the foreperson, it made clear that it believed "we have crossed the threshold where now there is good cause to discharge Juror No. 7," and that "it would be error and abuse of discretion for the Court to not do so." At that point, any further objection by the State would have been futile. The court was satisfied that it had conducted "enough of an investigation to resolve the matter" and that any further investigation would only serve to "open[] up Pandora's box" and "interfere with jury deliberations in a way that . . . would [not] comport with justice."

*C. Improper Discharge of Juror No. 7*

The State asserts the trial court abused its discretion by discharging Juror No. 7 for refusing to deliberate and for prejudging the case. We agree the record lacks sufficient evidence to show as a demonstrable reality that Juror No. 7 was unable to perform her duty as a juror. Under the standards

10

discussed and applied in *Cleveland*, *supra*, 25 Cal.4th 466, we conclude the court did not conduct an adequate inquiry into the allegations against Juror No. 7.  As a result, the court's decision to discharge her constitutes an abuse of discretion.

### 1. *Applicable Decisional Law*

In *Cleveland*, *supra*, 25 Cal.4th 466, the jury's foreperson sent a note to the trial court on the second day of deliberations.  The note requested "'an alternate to replace one juror.  One juror does not agree with the charge and does not show a willingness to apply the law.  One juror will not abide [by] the facts and apply the law.'" (*Id.* at p. 470.)  The trial court asked *all* the jurors if anyone was not following instructions.  Ten jurors said "yes."  After questioning each juror individually, the court determined the holdout juror "'is not functionally deliberating'" and seated an alternate in the juror's place.  (*Id.* at p. 473.)  The Supreme Court affirmed the Court of Appeal's reversal of the conviction because the discharge of the holdout juror violated the defendant's constitutional right to a unanimous jury verdict.  (*Ibid.*)

In so ruling, the Supreme Court observed, "[A] court may not dismiss a juror during deliberations because that juror harbors doubts about the sufficiency of the prosecution's evidence.  [O]ften the reasons for a request by a juror to be discharged, or the basis for an allegation that a juror refuses or is unable to deliberate, initially will be unclear.  [A] court must take care in inquiring into the circumstances that give rise to a request . . . lest the sanctity of jury deliberations too readily be undermined.  But we . . . adhere to established California law authorizing a trial court, if put on notice that a juror is not participating in deliberations, to conduct 'whatever inquiry is

11

reasonably necessary to determine' whether such grounds exist [citation] and to discharge the juror if it appears as a 'demonstrable reality' that the juror is unable or unwilling to deliberate. [Citations.]" (*Cleveland*, *supra*, 25 Cal.4th at pp. 483-484.) "Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*Id.* at p. 485.)

"If some inquiry is called for, the trial court must take care not to conduct an investigation that is too cursory." (*People v. Fuiava* (2012) 53 Cal.4th 622, 710.) Unlike in *Cleveland*, the trial court in this case did not interview all 12 jurors. Its inquiry was limited to interviewing Juror No. 2, the juror who first complained about Juror No. 7, and then Juror No. 1, whom Juror No. 2 had identified as having "raised concerns" about Juror No. 7. The court did not interview Juror No. 7, the foreperson or any of the other jurors. This type of limited inquiry, particularly after just 90 minutes of deliberation, is inconsistent with the inquiries routinely performed by trial courts under similar circumstances. In most instances, the court will interview all of the jurors before deciding whether a juror is unable or unwilling to deliberate. At a minimum, it must interview more than the complaining jurors. (*People v. Barber* (2002) 102 Cal.App.4th 145, 150-152 (*Barber*).) It also should interview the alleged problem juror to obtain his or her response to the complaints. (*People v. Compton* (1971) 6 Cal.3d 55, 60 (*Compton*).)

In *Barber*, all the jurors but one voted to find the defendant guilty. (*Barber*, *supra*, 102 Cal.App.4th at p. 151.) An

12

issue arose as to whether the holdout juror was refusing to deliberate. Of the 11 jurors who voted guilty, six informed the court that the holdout juror was deliberating in good faith. Instead of calling those jurors to testify, the trial court only questioned the five who claimed the holdout juror was not deliberating. (*Ibid.*) We determined this was reversible error, reasoning that to assess whether the juror had engaged in misconduct, the trial court also had to hear testimony from the six jurors who believed the holdout juror was deliberating in good faith. (*Id.* at pp. 153-154.) We concluded, "The hearing was fundamentally unfair because the court restricted the evidence primarily to witnesses supporting the prosecution's position. Proceedings that exclude relevant defense witnesses are constitutionally inadequate. [Citation.]" (*Id.* at p. 151; see *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1436-1437 [court determined misconduct issue after questioning all jurors].)

In *People v. Bowers* (2001) 87 Cal.App.4th 722, 726, the foreperson notified the trial court of his concern that Juror No. 4 had prejudged the case before deliberating. Again, the court questioned all 12 jurors. Although some jurors stated Juror No. 4 had "made up his mind early on" and had "'clammed up'" at times, the jurors conceded that Juror No. 4 engaged in some of the discussions and made his opinion known. (*Id.* at p. 732.) The Court of Appeal reversed the trial court's decision to discharge Juror No. 4, explaining, "While there was some evidence Juror No. 4 was inattentive at times during the deliberations and did not participate in the deliberations as fully as others, the record shows this conduct was a manifestation, effectively communicated to the other jurors, that he did not agree with their evaluation of the evidence -- specifically their credibility

13

determinations.  There appears no demonstrable reality that Juror No. 4 was unable to perform his function and [we conclude] he did not engage in serious and willful misconduct." (*Id.* at p. 730.)

In *Compton*, *supra*, 6 Cal.3d at p. 60, the trial court improperly removed a juror without questioning him first.  The juror reportedly had told a third person that he disliked being on the jury because it was hard to keep an open mind.  (*Id.* at p. 59.) The court excused the juror based on this ambiguous remark, electing not to "question the person most likely to know [its] meaning, [the juror] himself." (*Id.* at p. 60.)  The Supreme Court determined that because the evidence did not resolve the ambiguity in the juror's remark, the juror's inability to serve was not shown as a demonstrable reality.  The trial court was not entitled to resolve the ambiguity by presuming the worst of the juror.  (*Ibid.*; *People v. Franklin* (1976) 56 Cal.App.3d 18, 25-26; see *People v. Burgener* (1986) 41 Cal.3d 505, 520-521 [trial court abused its discretion by questioning only the jury foreperson regarding the possible misconduct of another juror, and by not questioning the juror at issue], overruled on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753.)

In *People v. Allen and Johnson* (2011) 53 Cal.4th 60 (*Allen*), two jurors informed the trial court that another juror, Juror No. 11, had prejudged the case while evidence was still being presented.  (*Id.* at p. 65.)  Juror No. 11 denied having made up his mind and voted "'undecided'" during a preliminary vote on the fourth day of deliberations.  (*Id.* at p. 66.)  After a lengthy investigation, in which the trial court questioned each juror individually, the court concluded Juror No. 11 had prejudged the case and was relying on evidence not presented at the trial.  The

14

court discharged him and seated an alternate juror. The reconstituted jury found the defendants guilty and later returned death verdicts. (*Id.* at p. 69.)

The Supreme Court reversed. (*Allen*, *supra*, 53 Cal.4th at p. 79.) It determined it is not improper for a juror to hold a preliminary opinion that a party's case is weak, "so long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations." (*Id.* at p. 73.) The record did not demonstrate that Juror No. 11 "refused to listen to all of the evidence, began deliberations with a closed mind, or declined to deliberate." (*Ibid.*) "The reality that a juror may hold an opinion at the outset of deliberations is . . . reflective of human nature." (*Id.* at p. 75.) Though Juror No. 11 appeared to hold a strong opinion about the prosecution's case, he participated in deliberations. Expressing opinions forcefully is not evidence of prejudgment or of a failure to deliberate. (*Id.* at p. 74.)

Finally, *Boeken*, *supra*, 127 Cal.App.4th 1640, is an example of a civil case in which the trial court conducted an adequate inquiry before discharging a juror. The foreperson had sent a note to the court indicating that Juror No. 5 was not participating in the discussion and was "'sit[ting] away from the table and read[ing] her [B]ible instead of contributing to the group conversation.'" (*Id.* at p. 1686.) In response to the note, the court reread to the jury the instruction stating that all jurors should participate in all deliberations. (*Ibid.*) After receiving another complaint from the foreperson, the court interviewed Juror No. 5 in chambers. Juror No. 5 denied that she had been reading her Bible during deliberations and also denied that she

15

sat away from the table, failed to listen or slept during deliberations. (*Ibid.*)

When the trial court received another complaint from the foreperson, it questioned *each juror individually* in chambers. From these interviews, the court found that Juror No. 5 had "separated herself physically from the other jurors, did not pay attention to the deliberations and, instead, slept or read a novel, the Bible, or both, throughout the two days . . . she was a member of the deliberating jury." (*Boeken*, *supra*, 127 Cal.App.4th at p. 1688.) Based on these findings, the Court of Appeal concluded that there was a demonstrable reality that Juror No. 5 had refused or was unable to deliberate and that the trial court had not abused its discretion in discharging her. (*Ibid.*)

### 2. *Analysis*

Here, the trial court's inquiry was unlike the one in *Boeken* and more like the one in *Barber*. The court only elicited evidence from two jurors, who coincidentally sat next to each other during trial, who carpooled together and who "had become very friendly." They reported that Juror No. 7 "adamantly" expressed her opinion at the outset of deliberations. This, in and of itself, is not evidence of prejudgment or a failure to deliberate. Indeed, when the court asked Juror No. 2 about how Juror No. 7 was listening to the views of other jurors, she responded, "Can I say not well?" Decisional law makes clear that deliberating "not well" is an inadequate basis for removal of a juror for failure to deliberate. (*Cleveland*, *supra*, 25 Cal.4th at p. 485 ["that a juror does not deliberate well or relies upon faulty logic or analysis . . . is not a ground for discharge"].) This answer alone should have prompted the court to conduct a further inquiry before removing Juror No. 7 from the panel.

16

Moreover, the record reflects that Juror Nos. 1 and 2 did not agree with Juror No. 7's initial opinion that the State was not liable. By only considering their views of Juror No. 7's alleged unwillingness to deliberate, the trial court "obtained an incomplete version of Juror No. [7]'s participation from those most likely to harbor resentment against [her]." (*Barber*, *supra*, 102 Cal.App.4th at p. 152.) In other words, the court's "findings were derived from a stacked evidentiary deck." (*Id.* at p. 153.)

We are not unsympathetic to the quandary a trial judge faces when confronted with complaints of juror misconduct. He or she must investigate the possibility of misconduct but not overstep and invade the sanctity of the jury's deliberations. But jurors may mistakenly conclude that a juror's disagreement with the majority constitutes an inability or refusal to deliberate. The Supreme Court has noted that "the [trial] court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view [citation], but laypersons may not understand this. [¶] It is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so. As we have stated, it is not required that jurors deliberate well or skillfully." (*People v. Engelman* (2002) 28 Cal.4th 436, 446 (*Engelman*).)

Accordingly, it is the trial court's duty to make a sufficient inquiry before discharging a juror during deliberations. (See *People v. Fuiava, supra,* 53 Cal.4th at p. 710.) Based on our review of the caselaw, we conclude that this type of inquiry was not performed here. At a minimum, the court should have interviewed Juror No. 7, the foreperson and at least some of the

17

jurors who had not complained about Juror No. 7. (See *Barber*, *supra*, 102 Cal.App.4th at pp. 150-152; *Compton*, *supra*, 6 Cal.3d at p. 60.) Only after hearing those views would the court be able to make an informed decision regarding whether the complaints from Juror Nos. 1 and 2 were founded on facts rather than on speculation. As stated in *Engelman*, "It is difficult enough for a trial court to determine whether a juror actually is refusing to deliberate or instead simply disagrees with the majority view. [Citations.] Drawing this distinction may be even more difficult for jurors who, confident of their own good faith and understanding of the evidence and the court's instructions . . . , mistakenly may believe that those individuals who steadfastly disagree with them are refusing to deliberate or are intentionally disregarding the law." (*Engelman*, *supra*, 28 Cal.4th at p. 446.) This is particularly true where, as here, the complaint about the juror was lodged after only 90 minutes of deliberation.

We recognize that the trial court also cited Juror No. 7's alleged inattentiveness during respondents' closing argument as a basis for determining she was refusing or unwilling to deliberate. The court was unable to determine if she was actually sleeping during the closing. If it had asked her to explain, she would have said that she was never asleep, that she had listened to all of the evidence and argument, and that she had closed her eyes briefly "because she was not feeling well." But the court, without any inquiry, assumed that by closing her eyes, Juror No. 7 had already made up her mind about the case. As previously discussed, the court may not assume the worst about a juror, especially without giving that juror an opportunity to explain herself. (*Compton*, *supra*, 6 Cal.3d at p. 60.) The speculation about Juror No. 7 sleeping was not good cause for removal, either

18

in isolation or combined with the other two jurors' accusations about her engagement in the deliberations. (See *People v. Bowers*, *supra*, 87 Cal.App.4th at p. 731 ["A juror must not be discharged for sleeping unless there is convincing proof the juror actually slept during trial"].)

As our Supreme Court has observed, "A trial court made aware of the possibility of a juror's misconduct, and particularly possible misconduct occurring during the jury's deliberations, is placed on a course that is fraught with the risk of reversible error at each fork in the road." (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 710.) We conclude the trial court in this case did not successfully navigate this course. In the absence of a manifest showing of misconduct, the court abused its discretion not only in discharging Juror No. 7, but also in failing to grant a new trial on the issue of allocation of fault, as discussed below.

### 3. Prejudice

Unlike in a criminal case, the parties were not entitled to a unanimous jury verdict. At least nine jurors had to vote for one side or the other with respect to each question presented on the special verdict form. (*Glage v. Hawes Firearms Co.*, *supra*, 226 Cal.App.3d at pp. 322-323.) The only issue on the form that was not decided by a unanimous or eleven-to-one vote was the comparative fault allocation. The jury found by a nine-to-three vote that the State was 90 percent at fault and that Castellon was 10 percent at fault for the accident that killed Shanks. Juror No. 7 stated in her declaration in support of the State's motion for new trial that, before her dismissal from the jury, she was "inclined toward [the State]," and that her initial vote during deliberations was in the State's favor.

19

A party shows harm where a "qualified and acting juror who, by some act or remark made during the trial, has given the impression that he favors one side or the other" is improperly discharged. (*Hamilton*, *supra*, 60 Cal.2d at p. 128.) In *Hamilton*, a capital case, a juror was improperly dismissed after asking a question that indicated she was considering a life sentence. (*Ibid.*) "To dismiss her without proper, or any, cause was tantamount to 'loading' the jury with those who might favor the death penalty. Such, obviously, was prejudicial to appellant." (*Ibid*; see *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1856 [prejudice shown where jury deliberated for three days with two or possibly three holdouts, and after two jurors were improperly dismissed, jury reached a verdict in three hours].)

Here, Juror No. 7's inclination to vote in the State's favor renders her dismissal from the jury prejudicial. (*Hamilton*, *supra*, 60 Cal.2d at p. 128; *People v. Delamora*, *supra*, 48 Cal.App.4th at p. 1856.) Respondents maintain that even if her dismissal was improper and prejudicial, the State is only entitled to a retrial on the issue of apportionment of fault. We agree. It is undisputed that the only aspect of the jury's verdict that could have been impacted by Juror No. 7's vote in favor of the State was the apportionment issue. (See, e.g., *Schelbauer v. Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 459 [modifying new trial order on all issues to limit retrial to apportionment where the only claimed defect in the verdict related to apportionment].) We therefore remand the matter to the trial court for a retrial on apportionment of fault.

## DISPOSITION

The judgment is reversed in part and the matter remanded to the trial court for retrial on the issue of

20

apportionment of fault between the State and Castellon. In all other respects, the judgment is affirmed. The State shall recover its costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

PERREN, J.

We concur:

GILBERT, P. J.

TANGEMAN, J.

Kevin G. DeNoce, Judge
Superior Court County of Ventura
_____

Jeanne E. Scherer, Chief Counsel, Jerald M. Montoya, Deputy Chief Counsel, and Mark Berkebile for Defendant and Appellant.

The Homampour Law Firm and Arash Homampour; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Respondents.