Filed 10/17/24  P. v. Horton CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B332643 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA106976) |
| v. | |
| LAMONT EDWARD HORTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph J. Burghardt, Judge.  Affirmed.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Lamont Edward Horton appeals from his jury conviction of first degree murder (Pen. Code, § 187, subd. (a)),[1] contending the trial court erred in denying his motion for a mistrial based on juror misconduct. He contends there was good cause under section 1089 to discharge one of the jurors for "refusing to deliberate." Although the record shows the juror got sick and left the jury room during deliberations, it does not show a demonstrable reality that the juror refused to deliberate. On the contrary, deliberations simply paused and resumed the next day without incident. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

A.    *Charges, Conviction, and Sentencing*

On August 11, 2022, around 10:30 a.m., Tre Matthis heard two loud voices coming from the apartment below his: one male voice and the other female. The male voice yelled angrily, and the female voice screamed for help. Matthis immediately went to the leasing office at the apartment building and told the front desk attendant someone needed to investigate what was going on in the unit.

Joel Vierra, the building manager, went to the apartment below Matthis's apartment. Tiffany Hall lived there and was married to Horton. Vierra knocked on the door and heard the deadbolt close, but no one answered. Minutes later, while Vierra

---

[1]    All undesignated statutory references are to the Penal Code.

[2]    Because the only issue before us on appeal relates to juror misconduct, we provide an abbreviated summary of the evidence underlying Horton's conviction.

was still standing outside Hall's front door, he saw a thin, African American man walking toward him with his head down and wearing a hat, tennis shoes, and shorts with tights underneath. Vierra yelled, " 'Hey, stop,' " but the man turned around and ran toward an exit.

Around 10:50 a.m., Officer Matthew Cordova of the Santa Monica Police Department (SMPD) heard a radio call regarding the incident and drove towards Hall's apartment building. As Cordova neared the building, he saw Horton, who matched the description of the suspect on the radio call, running along the sidewalk. Cordova pursued Horton and eventually placed him in handcuffs. Horton had blood on his cheek, hand, and sneaker.

SMPD officers searched Hall's apartment and found large pools of blood in the kitchen and living room. There was a bloody knife in the kitchen sink, and Hall's body was stuffed inside a small suitcase. It was later determined Hall died of multiple stab wounds. A DNA analysis showed the blood on Hall and the knife contained Horton's DNA. The blood on Horton contained Hall's DNA.

The Los Angeles County District Attorney charged Horton in an information with murder (§ 187, subd. (a)) and alleged that Horton personally used a deadly or dangerous weapon in committing the murder (§ 12022, subd. (b)(1)). The People additionally alleged that Horton had two prior "strike" convictions (§§ 667, subds. (b)-(j); 1170.12, subd. (b)).

The trial began in May 2023. Horton testified that on the day of the murder, he got into an argument with Hall. During the argument, he "blacked out," and then at some point, he regained consciousness, saw a lot of blood, and ran out of the apartment. Horton admitted, "I believe I'm the reason why [Hall]

3

is not here. I believe I'm the cause of her death." However, Horton testified he did not remember how Hall died.

After two days of deliberations, the jury convicted Horton of first degree murder and found the knife enhancement true. Horton waived his right to a jury trial on the allegations that he had two prior strike convictions, and after a court trial the court found them to be true. The court sentenced Horton to 76 years to life in state prison, consisting of 75 years to life for the murder under the Three Strikes law and one year for the knife enhancement. Horton timely appealed.

B.     *Relevant Jury Deliberations and Post-trial Motion*

At some point during the evidentiary portion of the trial, when there was one alternate juror left, Juror No. 9 asked the judicial assistant, " 'What happens if we lose all the alternates?' " The judicial assistant responded, " 'That's not going to happen before we finish.' " Juror No. 9 then asked, " 'When are we going to finish?,' " to which the judicial assistant responded, " 'You need to talk to the judge.' " Judge Joseph Burghardt answered Juror No. 9's questions in front of the entire juror panel.

On May 11, 2023, before closing arguments began, Juror No. 9 called the judicial assistant to say she was running late because she "had an emergency with [her] dog." Judge Burghardt took a recess to wait for Juror No. 9 to arrive. Once Juror No. 9 arrived at approximately 10:30 a.m., both sides gave closing arguments.

Around 12:00 p.m., Juror No. 9 asked Deputy Kusak, " 'Where is the trial going to take place?,' " and " 'Is it normal for jurors to be dropping out during the trial?' " Kusak told her to ask her questions after the lunch break. After the lunch break, Juror No. 9 did not ask any questions. The People gave their

4

rebuttal argument followed by the court's final instructions. Around 2:00 p.m., the jury began its deliberations.

About an hour later, one of the jurors called the judicial assistant and said that one of the female jurors was sick. The judicial assistant told Kusak about the situation. Kusak approached the room where the jurors were deliberating and saw two jurors, including Juror No. 9, outside in the hallway. Juror No. 9 was sitting on the floor and said, " 'I just threw up.' " When Kusak asked if he should call the paramedics or if she had a medical condition, Juror No. 9 said repeatedly, " 'No, I just don't want to be here anymore.' " Juror No. 9 repeatedly asked, " 'Am I going to jail?' " The bailiff told her, " 'This has nothing to do with jail. I just want to make sure you're okay.' " Juror No. 9 said, " 'Am I being held hostage right now?' " She repeatedly said, " 'I want to go home, and I don't want to do this.' " Kusak responded, " 'As of right now, you cannot go home.' "

Kusak left Juror No. 9 in the hallway with the second juror who was trying to calm her down. Kusak spoke to Judge Burghardt about what happened. At this point, there were no alternate jurors left. Based on Judge Burghardt's instructions, the deputies obtained contact information from the jurors and excused them for the day, with instructions for all of them (including Juror No. 9) to call the court the next morning and on a daily basis until Juror No. 9 was able to come back to court and finish the deliberations. All the jurors left at around 3:30 p.m. Judge Burghardt did not inform either party about the situation.[3]

---

[3]     On appeal, Horton does not challenge Judge Burghardt's decision not to inform the parties about Juror No. 9's conduct.

The next morning, May 12, Juror No. 9 called the judicial assistant and said she was able to return to court. She came to court, and the jury resumed its deliberations around 10:49 a.m.

At approximately 2:45 p.m., the jury sent the court a note requesting a copy of the closing arguments. Judge Lauren Birnstein was covering for Judge Burghardt for the afternoon. In discussing how to respond to the jury question, Judge Birnstein commented, "One of the jurors is very, very problematic and does not want to be around." (Judge Birnstein later indicated Judge Burghardt had advised her this was the case.) Around 3:39 p.m., the jury indicated it had reached a verdict.

Before Judge Birnstein called the jury into the courtroom for the verdict to be read, defense counsel requested "to put some things on the record." Counsel stated, "I learned some information about Juror No. 9 and some of the issues that [were] going on around with her. I believe . . . she was found outside of the jury room, the original jury room." Judge Birnstein subsequently questioned the court deputies, the judicial assistant, and the attorneys for both sides about the facts concerning Juror No. 9.[4]

After the investigation, Judge Birnstein found there was no evidence the jury deliberations contained "anything strange" or "anything wrong whatsoever." The court stated, "[O]ne would assume that if there were problems during deliberations, the jury would have sent a note. . . . Any one of those jurors could have sent a note if there was anything strange going on during the

---

[4] The facts included above are derived from Judge Birnstein's investigation.

6

deliberations." The court proposed taking the verdict and holding the jury in the courtroom for additional questioning.

Defense counsel objected to Judge Birnstein taking the verdict and made an oral motion for a mistrial based on "juror misconduct." Defense counsel argued, "I think that [the jurors] were not all together at the same time. There were two jurors that were outside. We don't know whether the other jurors continued to deliberate or not. It's just not clean. [¶] And I was just not notified of this at all. . . . I knew that this juror was particularly problematic. But I was hoping that she would be more in line and follow the directions and orders of the court. [¶] It doesn't seem that she has, and so I think that that taints the entire process and the sanctity of what is required for Mr. Horton in terms of due process and a fair trial."

Judge Birnstein denied the mistrial motion.[5] Before bringing the jurors back into the courtroom, the judge invited the parties to propose additional questions to ask the jurors. Defense counsel proposed questions and did not object to the court's final questions.

After the verdict was read, Judge Birnstein addressed the jurors and stated, "So it's my understanding that one of the jurors fell ill during the course of the deliberations, and that the juror was observed to be outside of the deliberation room in the hallway – in the back hallway here. And there was another juror who was caring for her at that time. [¶] So my first question . . . is: Did any deliberations whatsoever, meaning talking about the case or the facts, the evidence, the law – did any of that go on

---

[5] Horton does not challenge Judge Birnstein's decision to rule on the motion for a mistrial in Judge Burghardt's place.

7

while the two jurors were outside or any juror was outside of the deliberating room?" Each juror answered, "No," except for Juror No. 9 who said, "I wasn't in the room."

Judge Birnstein then asked the jurors, "Do you believe that all of the jurors followed the instructions of the law as given to you by Judge Burghardt? . . . [¶] Your proceedings, your procedure, all of that, do you think all the jurors followed the law that he gave you?" The foreperson answered, "Yes," and all the other jurors agreed. Thereafter, Judge Birnstein excused the jurors from further service.

Once the jurors left the courtroom, defense counsel stated, "I would point out that [Juror No.] 12 lied when he said that there were no deliberations inside the room. There's no way he would have known that when he was outside in the hallway helping [Juror No.] 9." Judge Birnstein replied, "But . . . all the other jurors answered that no deliberations took place."[6]

## DISCUSSION

Horton argues the trial court erred in denying his motion for a mistrial based on the trial court's refusal to dismiss Juror

---

[6] Later, defense counsel filed a petition to release juror information under Code of Civil Procedure section 237. Judge Burghardt denied the motion, concluding the defense did not make a prima facie showing of good cause under the statute. In denying the motion, Judge Burghart stated, "[I]t was pretty clear that Juror No. 9 did not want to be there, did not want to be a juror," but there was no "evidence that there was any misconduct in the deliberation process" or that "she refused to deliberate." Because Horton appeals only Judge Birnstein's denial of the mistrial motion, Judge Burghardt's order is not relevant to our analysis.

No. 9. Horton claims there was " 'good cause' " under section 1098 to dismiss Juror No. 9 because she "refused to deliberate."

We review the denial of a mistrial motion under the deferential abuse of discretion standard. (*People v. Ramirez* (2006) 39 Cal.4th 398, 462; *People v. Silva* (2001) 25 Cal.4th 345, 372.) " 'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged' " (*Ramirez*, at p. 462), i.e., where " 'the court is apprised of prejudice that it judges incurable by admonition or instruction' " (*People v. Suarez* (2020) 10 Cal.5th 116, 148).

The trial court did not abuse its discretion in finding there was no juror misconduct under section 1089, and thus the court did not abuse its discretion in denying the motion for a mistrial. (See *People v. Harris* (2013) 57 Cal.4th 804, 857 [finding no abuse of discretion in denying defendant's motion for mistrial in the absence of proof of prejudicial juror misconduct].)

A.    *Section 1089*

"[S]ection 1089 ' "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' " ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1211; see § 1089.) "The most common application of [section 1089] permits the removal of a juror who becomes physically or emotionally unable to continue to serve as a juror due to illness or other circumstances." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485; see *People v. Jones* (2020) 50 Cal.App.5th 694, 700 (*Jones*) ["Dismissal may be appropriate [under section 1089] when a juror is emotionally unable to continue" with deliberations].) Section 1089 has also "been applied to permit the removal of a juror who refuses to deliberate,

9

on the theory that such a juror is 'unable to perform his duty' within the meaning of [] section 1089." (*Cleveland*, at p. 475; see *People v. Alexander* (2010) 49 Cal.4th 846, 926 ["The court properly may dismiss a juror based on the juror's "unwillingness to engage in the deliberative process."].)

" 'The trial court's authority to discharge a juror includes the authority to conduct an appropriate investigation concerning whether there is good cause to do so.' " (*People v. Alexander*, *supra*, 49 Cal.4th at p. 926; see *People v. Beeler* (1995) 9 Cal.4th 953, 989, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462 ["The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry."].) " 'Great caution is required when deciding to excuse a sitting juror.' " (*Jones*, *supra*, 50 Cal.App.5th at pp. 700-701, quoting *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71.) "[T]o ensure the sanctity and secrecy of the deliberative process, a trial court's inquiry into grounds for discharging a deliberating juror should be as limited as possible, and should cease once the court is satisfied that the juror in question 'is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 53.) A court may not resolve ambiguity as to a juror's state of mind by "presuming the worst" of a juror. (*Jones*, at p. 702; accord, *Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, 553.)

" 'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's

functions must be shown by the record to be a "demonstrable reality." The court . . . will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 807; see *People v. Rangel*, *supra*, 62 Cal.4th at p. 1211 [" ' "[W]hen a trial court's denial of a motion to discharge a juror is supported by substantial evidence, it will be upheld." ' "].)

B.   *The Trial Court Did Not Err in Denying Horton's Motion for a Mistrial*

The record does not show a "demonstrable reality" that Juror No. 9 was unable or unwilling to perform her duties. (*People v. Jablonski*, *supra*, 37 Cal.4th at p. 807.) Judge Birnstein conducted a sufficient investigation into possible juror misconduct, examining court staff, bailiffs, and attorneys who interacted with Juror No. 9 or overheard her interactions with others. The investigation revealed that during the evidentiary portion of the trial and during breaks between closing arguments, Juror No. 9 asked the judicial assistant and bailiff several questions about trial procedures, such as " 'When are we going to finish?,' " and " 'Is it normal for jurors to be dropping out during the trial?' " Juror No. 9 also professed to have an emergency with her dog that caused her to be late on the day of closing arguments. The court appropriately determined none of that conduct constituted misconduct.

The investigation also showed that an hour after deliberations began, Juror No. 9 left the jury room and sat in the hallway. She said, " 'I just threw up,' " " 'I just don't want to be here anymore,' " and " 'I want to go home.' " At that point, Judge Burghardt excused all the jurors for the remainder of the

11

afternoon. The next morning, Juror No. 9 returned to court and deliberated for several hours before reaching a verdict. When questioned, the jurors agreed that deliberations paused when Juror No. 9 left the jury room, and they followed the law at all times. Judge Birnstein did not abuse her discretion in finding no misconduct as a result of Juror No. 9 leaving the room.[7]

"By statute, illness is cause to dismiss a juror." (*People v. Duff* (2014) 58 Cal.4th 527, 560.) However, "[w]hether a juror's illness can best be accommodated by a continuance or replacement with an alternate is a matter committed to the trial court's discretion." (*Id*. at p. 561.) The court's decision to continue the case to the next morning was not an abuse of discretion. Juror No. 9 became sick when the evidentiary portion of the trial ended, and the jury started deliberating. Because the presentation of evidence had concluded, a brief continuance to the

---

[7] Although Horton's brief contains a heading stating, "The judgment should be reversed for juror misconduct because Juror No. 9 refused to deliberate *and deliberations were undertaken in her absence*" (italics added; capitalization omitted), Horton provides no evidence or argument that deliberations took place when Juror No. 9 was outside the jury room. He has forfeited the contention on appeal. (See *Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1458 [" 'Mere suggestions of error without supporting argument or authority . . . do not properly present grounds for appellate review.' "]; accord, *In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Horton also suggests in passing that Juror No. 9's questions and repeated statements that she wanted "to go home" after becoming ill suggest she "may have encouraged the jury to convict so she could . . . 'go home.' " This speculative argument lacks any factual or legal support and is likewise forfeited. (See *In re S.C.*, at p. 408.)

12

next morning did not impair either party, and Horton does not contend otherwise. (Cf. *ibid*. [court did not abuse discretion in excusing ill juror who would likely be out for two days because a two-day continuance "would result in a lengthy gap between presentation of evidence and closing arguments on one or both sides, a gap that might impair either party's presentations or impact juror deliberations"].) More importantly, the record shows that the brief continuance resolved any doubt about Juror No. 9's capabilities as a juror. Juror No. 9 returned the next day and deliberated without any further complications.

Horton argues the record shows as a " 'demonstrable reality' " that Juror No. 9 was "refusing to deliberate" when she sat in the hallway and said she did not want to be there anymore. We reject the argument. "Even the most diligent juror may reach the end of his attention span at some point during a trial." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 418, overruled on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) In *People v. Henderson* (2022) 78 Cal.App.5th 530, the appellate court held the trial court erred by " 'presuming the worst' " of a juror and discharging him under section 1089 when "[a]t best, the evidence established that [the juror] was looking forward to his jury duty being over, a sentiment that does not strike us unusual for jurors in a lengthy trial, especially when trying to juggle work and perform their civic duty at the same time." (*Henderson*, at pp. 562-563.) The court held that "[s]uch a feeling did not signal that the juror could not perform his duty." (*Id*. at p. 563.)

*Jones*, *supra*, 50 Cal.App.5th 694 is also instructive. In *Jones*, after the jury began deliberating, Juror No. 10 left the jury room and told the courtroom clerk that another juror revealed

13

extraneous information during deliberations about the defendant's prior criminal history. (*Id.* at p. 689.) Juror No. 10 felt " 'extremely upset' " and " 'somewhat coerced' " by the event because the other juror revealed the information after Juror No. 10 had expressed reservations about the charges. (*Id.* at p. 701.) The trial court asked Juror No. 10 if " 'it would be very difficult for you to continue in your deliberations,' " to which Juror No. 10 replied, "Yes." (*Ibid.*) Finding that Juror No. 10 had expressed " 'an inability to continue deliberating,' " the trial court dismissed Juror No. 10. (*Id.* at p. 699.)

Our colleagues in *Jones* concluded the record did not show, as a demonstrable reality, that Juror No. 10 was unwilling to continue deliberating. (*Jones*, *supra*, 50 Cal.App.5th at pp. 704-705.) "Juror No. 10 never requested to be discharged, nor did she ever say she was unwilling or unable to continue deliberating." (*Id.* at p. 701.) Also, the trial court "never asked [Juror No. 10] directly whether she could continue." (*Id.* at p. 702.) Rather, the court asked her if it would be " 'very difficult' " for her to continue, which invited an "equivocal" response—"Juror No. 10 could have meant she was incapable of continuing to deliberate, or she could have meant she was capable of continuing to deliberate but it would be hard to do so." (*Ibid.*) When a juror's answer is ambivalent, the court is " 'not entitled to . . . presum[e] the worst.' " (*Ibid.*)

Like the juror in *Jones*, here, Juror No. 9 never requested to be discharged, nor did she ever say she was unwilling to continue deliberating altogether. Rather, she expressed not wanting to be there and wanting to go home at that point in time. She had deliberated without incident for an hour before she took ill. And even if Juror No. 9's conduct in the hallway could have

been interpreted as an expression of her refusal to continue to deliberate, that possibility was quickly dispelled the next morning when Juror No. 9 returned to court and resumed deliberating. (See *People v. Goldberg* (1984) 161 Cal.App.3d 170, 191-192 [no abuse of discretion in keeping juror where juror became extremely upset and asked to be excused, but after discussing the issue with the judge, juror agreed to continue deliberating].)

In sum, the record does not indicate that Juror No. 9 refused to deliberate or was unable to perform her duty as a juror. The trial court did not abuse its discretion in finding there was "nothing . . . wrong whatsoever" with the jury deliberations. Because there was no juror misconduct, it follows that the record is absent of any "incurably prejudicial" incident that would justify granting a mistrial motion. (*People v. Suarez, supra*, 10 Cal.5th at p. 148.) Thus, we conclude the trial court did not abuse of discretion in denying the mistrial motion.[8]

## DISPOSITION

The judgment is affirmed.

STONE, J.

We concur:

MARTINEZ, P. J.                    SEGAL, J.

---

[8] To the extent Horton contends the court's failure to discharge Juror No. 9 violated his state and federal constitutional rights, we reject the claim. The "conclusion that the trial court did not violate [section 1089] necessarily disposes of [a defendant's] constitutional claims." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1410.)

15