Filed 6/15/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br><br>BRIAN ZACHARY JONES,<br><br>     Defendant and Appellant. | A155720<br><br>(Alameda County<br>Super. Ct. No. H58702) |

     This case requires us to review a trial court's decision to remove a potential hold-out juror in a murder case.  Following a fatal alcohol-related car crash in May 2015, a jury convicted Brian Zachary Jones of two counts of second degree murder (Pen. Code, § 187, subd. (a)) and other crimes.  He appeals, asserting that the trial court erred in discharging a juror who felt coerced or bullied by a second juror.  The second juror had disclosed Jones's criminal history, which was not part of the record at trial, and was also discharged.  We agree with Jones that the record does not support discharging the first juror, and we reverse.

**BACKGROUND**

**A.**

     The People charged Jones with four felony counts: murder (Pen. Code, § 187, subd. (a); counts one and two); driving under the influence of alcohol and causing injury (Veh. Code, § 23153, subd. (a); count three); and driving with a blood alcohol level above .08 percent (Veh. Code, § 23153, subd. (b); count

1

four). For counts three and four, Jones was also charged with an enhancement for driving at least 30 miles per hour over the speed limit in violation of the prohibition on reckless driving (Veh. Code, § 23103).

A jury found Jones guilty on all counts in November 2017. In October 2018, the trial court sentenced him to consecutive indeterminate terms of 15 years to life in prison for counts one and two and concurrent two-year prison terms for counts three and four, for a total sentence of 30 years to life.

## B.

At the outset of trial, Jones filed a motion in limine to exclude evidence of his 2003 misdemeanor conviction for alcohol-related reckless driving. Jones argued there was a significant risk that the jury would use the evidence improperly to conclude that he had a propensity for lawlessness or that the fact that he had a "reckless" driving conviction meant he had a reckless disregard for life in connection with the intent element of the murder charges. In response, the People agreed not to rely on the prior conviction in its case in chief.

## C.

At trial, the facts were largely undisputed. The evidence showed that a few months before the crash, Jones had taken a two-day driving course on how to safely operate his new Corvette. The day of the crash, Jones attended the Livermore Wine Festival with a friend and had food and beer. Jones later admitted that he drank five 4-ounce cups of beer at the festival; he also later ordered a 22-ounce beer at a restaurant. There was no dispute that Jones was the driver or that his blood alcohol level was above .08 percent at the time of the crash.

Just before the crash, at around 6:50 p.m., Jones drove his Corvette down a street in Livermore with a posted speed limit of 35 miles per hour.

2

Jones stopped at a red light. When the light turned green, Jones accelerated the Corvette to a high rate of speed.

At the time of the accident, the Corvette was travelling over 90 miles per hour. The Corvette jumped the curb at a bend in the road near the home of Rosa and Juan M., who were hosting a family party. After hitting a utility box, Jones's Corvette struck and killed Rosa's cousins, Esperanza R. and her one-year-old daughter, Y.P. Two other children at the party were injured.

The only dispute at trial concerned the murder charges. The defense argued that the prosecution failed to prove the third and fourth elements of second degree murder – that at the time the defendant acted, he knew that his actions were dangerous to human life and that he deliberately acted with a conscious disregard for life. The prosecution argued that Jones knew his actions could kill someone but he did not care: after drinking all afternoon, Jones drove 99 miles per hour in a residential area clearly marked with a speed limit of 35 miles per hour. The prosecution argued that anyone should know that Jones's actions were dangerous, and his actions demonstrated a conscious disregard for human life.

The defense conceded that a reasonable person would have known that Jones's actions "would create a likely risk of death" and that Jones therefore had committed gross negligence. But the defense asserted he was not guilty of second degree murder because the prosecution had not shown that he subjectively knew he was likely to kill someone and acted anyway. The defense's theory was that the special driving class for Corvette owners, coupled with his level of intoxication at the time of the accident, made Jones overconfident in his driving abilities, and he did not know he was likely to kill anyone. Because the traffic light was green, Jones believed he had the

right of way.  Once he realized what was happening, he hit the brakes and tried to get control of the car and steer away from the victims.

## D.

The day after the jury began deliberating, Juror No. 10 left the jury room during a break and informed the courtroom clerk that another juror revealed in deliberations that Jones had a prior conviction for driving under the influence of alcohol.  The court ordered the jury not to resume deliberations pending further inquiry.  When the court questioned Juror No. 10 on the record, she reported: "Another juror made a comment that Mr. Jones had had a prior DUI" and "indicated that she had seen that in the newspaper.  I was extremely upset."  The other juror made the revelation after Juror No. 10 expressed she "was having problems" with the third and fourth elements of the second degree murder charge.  Juror No. 10 was "somewhat coerced in how [she] felt."

Juror No. 10 also reported that, after the revelation, "everybody's mouth sort of fell open . . . .We had heard what she said but it was almost as if you couldn't believe what had been said."  She was "shocked," and other jurors had a similar reaction.  Juror No. 10 explained that after the jurors called for a break, "[t]he foreman, prior to us departing the room, had simply stated: 'Just strike that from the record.'  Well, I'm unable to do that, Your Honor."  The court asked Juror No. 10, "were you shocked at the fact that another juror even brought this information forward or were you shocked by the information" itself?  Juror No. 10 responded that she "felt it was said to persuade me to agree with them on Item No. 3 for the murder charge."

The court then stated: "You did indicate that the information that you received and the context within which you received it and kind of the impression that you had as to why it was being brought up would make it

4

very difficult for you to continue in your deliberations; is that fair?" Juror No. 10 responded: "[y]es," and explained that she was concerned with "the way it was stated" because the statement about the prior conviction was made with "attitude."

At no time did Juror No. 10 ask to be dismissed or state that she could not continue deliberating. The court invited Juror No. 10 to wait in the witness room, and she accepted.

The court then questioned each of the other jurors, including the individual who had referenced the prior conviction, whom the jury foreperson identified as Juror No. 9. Like Juror No. 10, some of the remaining jurors indicated that they were "surprised" or "taken aback." The court asked each of the jurors—other than Jurors Nos. 9 and 10—whether they would be able to disregard the information about a prior conviction, and each responded affirmatively.

After questioning each juror, the court dismissed Juror No. 9 for misconduct, concluding that she violated the court's instructions to disregard extraneous information.

Over defense counsel's objection, the court also dismissed Juror No. 10. The court explained: "Juror No. 10 has expressed, I think in fairly clear terms, an inability to continue deliberating based upon, not so much the information but . . . in many ways the way in which it was presented to her. She indicated that she felt that she was being bullied, that it was directed at her and it was done not to just persuade her to go in one particular direction but she use[d] the . . . term 'bullying' and indicated she would be unable to participate in the process further. For that reason, the Court is inclined to dismiss that juror."

Jones moved for a mistrial. In addition to arguing that Juror No. 9's misconduct tainted the remaining jurors, Jones observed that Juror No. 10 was dismissed even though she "did absolutely nothing wrong." "She followed [the] Court's instructions" and "deliberated with everyone else." Juror No. 10 "was voting for manslaughter," "[b]ut because another juror engaged in misconduct, . . . Juror No. 10 is out, and we no longer have a juror who is voting for manslaughter." The court denied the motion, concluding the juror misconduct was not prejudicial because the remaining jurors, when questioned by the court, "indicated in no uncertain terms that they would be able to disregard [Jones' prior conviction] and not take it into account." With respect to Juror No. 10, the court said that she had been so upset by the perceived bullying by Juror No. 9 that she had left the jury room and was unwilling or unable to continue deliberating.

The court reinstructed the remaining jurors, substituted in two alternate jurors, and directed the jury to begin deliberating anew. After about four and one-half hours of deliberations, the jury returned unanimous guilty verdicts on all charges.

## DISCUSSION

Jones asserts that the record does not support the trial court's dismissal of Juror No. 10. We agree.

### A.

A trial court may dismiss a juror if the court finds the juror is "unable to perform his or her duty." (Pen. Code, § 1089; *People v. Armstrong* (2016) 1 Cal.5th 432, 450 (*Armstrong*).) Dismissal may be appropriate, for example, when a juror is emotionally unable to continue or expresses a fixed conclusion at the beginning of deliberations and refuses to engage with other jurors. (See *People v. Cleveland* (2001) 25 Cal.4th 466, 474, 485 (*Cleveland*).)

6

"Great caution is required when deciding to excuse a sitting juror." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 (*Allen and Johnson*).) If a juror's willingness or ability to continue deliberating is unclear, the court must inquire further before dismissing the juror. (*Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, 551-557 (*Shanks*).) The inquiry must be sufficient to determine the facts that demonstrate a juror's ability or inability to deliberate (*People v. Burgener* (1986) 41 Cal.3d 505, 519, overruled on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753) and may not assume the worst about a juror without giving her an opportunity to explain herself. (*People v. Compton* (1971) 6 Cal.3d 55, 60 (*Compton*); *Shanks, supra*, 9 Cal.App.5th at p. 556.)

When reviewing a dismissal, our Supreme Court has adopted a heightened standard of review that protects the defendant's fundamental rights to due process and a fair trial. (*Armstrong, supra*, 1 Cal.5th at p. 450; Cal. Const., art. I, § 16 [trial by jury is an "inviolate right"].) The juror's inability to perform his or her duty must appear in the record as a "demonstrable reality." (*Armstrong, supra,* 1 Cal.5th at p. 450.) Our Supreme Court has emphasized that this test is "more comprehensive and less deferential" than the substantial evidence test. (*Id.* at p. 451.) Under both tests, the appellate court reviews the entire record and does not reweigh the evidence. (*Id.* at pp. 450-451.) However, under the substantial evidence test, the court reviews the record in the light most favorable to the judgment and upholds it if there is credible evidence that *could* reasonably support the trial court's decision to remove a juror. (*Id.* at p. 450.) Under the demonstrable reality test, by contrast, we must determine whether the trial court actually *did* rely on evidence that supports removing the juror. (*Id.* at p. 451.) It thus requires us to review the " 'record of reasons' " that the trial

7

court provided, identify the evidence on which the court actually relied, and determine whether the evidence manifestly supports the court's reasons. (*Ibid*.)

**B.**

Accordingly, we begin with the reasons that the trial court provided for excusing Juror No. 10. In the court's view, she expressed an "inability to continue deliberating" and felt "bullied" when Juror No. 9 pointed to extraneous information in an attempt to persuade her that the elements for second degree murder were met.

The evidence supporting this conclusion is limited. Juror No. 10 told the court she was "extremely upset" by Juror No. 9's disclosure of the prior arrest and "felt somewhat coerced" because Juror No. 9 said it after Juror No. 10 had expressed reservations about one of the murder charges. The court asked Juror No. 10 if it was "fair" to say that "it would be very difficult for you to continue in your deliberations" because of Juror No 9's actions and "the impression that you had as to why it was being brought up." Juror No. 10 replied, "Yes," and added that Juror No. 9's disclosure of the prior arrest was stated "with attitude."

This does not meet the heightened standard. Juror No. 10 never requested to be discharged, nor did she ever say she was unwilling or unable to continue deliberating. (Cf. *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1855-1856 [record did not support discharge of jurors who, among other factors, never requested discharge or said they could not continue].) She had, in fact, been deliberating without incident since the day before. The court never asked her directly whether she could continue. Instead, the court asked her if it would be "very difficult" for her to continue. At best, the question is ambiguous, which is insufficient. (*Allen and Johnson*, *supra*, 53

8

Cal.4th at p. 72 [dismissal was improper where juror's statement suggesting that he prejudged the case was "not entirely clear"].)

Our Supreme Court's decision in *Compton, supra,* 6 Cal.3d 55, is instructive. *Compton* held that a juror's out-of-court statement that " 'he didn't like to be on a case like this because it was hard to keep an open mind' " was insufficient to justify the juror's discharge without further inquiry. (*Id.* at pp. 59-60.) The Court explained that the juror's statement was "equivocal": he could have meant that he was incapable of remaining impartial, or he could have meant "only that he found the facts of the case distasteful and would be compelled to make a special effort to remain objective, although he was capable of doing so." (*Ibid.*)

Similarly, here, the phrase "very difficult" is equivocal. Juror No. 10 could have meant she was incapable of continuing to deliberate, or she could have meant she was capable of continuing to deliberate but it would be hard to do so. As in *Compton*, Juror No. 10's inability to continue as a juror did not appear in the record as a demonstrable reality because "the ambiguity [in the juror's statement] was never resolved by proof, and the court was not entitled to do so by presuming the worst." (See *Compton, supra,* 6 Cal.3d. at p. 60; see also *People v. Bennett* (2009) 45 Cal.4th 577, 623 [there was "no evidence in the record to support the conclusion that the juror was unable to perform his duty" where the juror expressed that he would have difficulty verbally confirming his vote for the death penalty but ultimately stated under questioning that " 'it's difficult to do it, but I can do it' "].)

Further inquiry also may have resolved Juror No. 10's concerns about the extrinsic material and about Juror No. 9. In *People v. Goldberg* (1985) 161 Cal.App.3d 170, for example, a juror became "extremely upset" and asked to be excused after another juror improperly referred to a news article during

deliberations. (*Id.* at p. 191.) She agreed to continue after the trial court discussed the issue with her, commended her for reporting the misconduct, and explained why the trial was not irredeemably tainted. (*Id.* at pp. 191-192.) Here, a similar discussion may have reassured Juror No. 10, particularly given the court's decision to dismiss Juror No. 9, the alleged bully.

We do not suggest that the trial court must ask particular questions or attempt to rehabilitate a juror when confronted with a concern about the juror's ability to deliberate. The court has leeway to "conduct 'whatever inquiry is reasonably necessary to determine' whether" there are grounds for dismissal. (*Cleveland, supra,* 25 Cal.4th at p. 484.) However, if the court elects to dismiss a juror, the court's inquiry must be sufficient to support the dismissal. (See, e.g., *Shanks, supra,* 9 Cal.App.5th at p. 556 ["[I]t is the trial court's duty to make a sufficient inquiry before discharging a juror during deliberations"].) And the court should take care to ensure the record reflects both its reasoning and supporting evidence so that a reviewing court can "be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Armstrong, supra,* 1 Cal.5th at p. 451; *People v. Barber* (2002) 102 Cal.App.4th 145, 151-152 [the court "may make " 'whatever inquiry is reasonably necessary to determine' " if there is misconduct [Citations.] But the court may not dismiss a juror unless it appears as a 'demonstrable reality' that the juror is unable or unwilling to deliberate"].)

The dismissal of Juror No. 10 on an ambiguous record is particularly problematic because she had indicated that she was "having problems" with the elements for the murder charges. Virtually any juror whose views differ from those of others on the panel may feel "somewhat coerced" or that the

10

deliberation process is "very difficult." (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1255 ["jurors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means"].) Our Supreme Court adopted the demonstrable reality test because "the removal of a seated juror for failing to deliberate is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury." (See *Armstrong*, *supra*, 1 Cal.5th at p. 454.) The removal of Juror No. 10—a potential holdout juror in a murder case—illustrates the need for a record that manifestly supports the trial court's reasoning.

The People argue that Juror No. 10 was properly dismissed because, in the deliberations, the foreman told the jurors to "strike" the extrinsic evidence, and Juror No. 10 said she could not do so. But we may only consider the " 'the record of reasons the court provides' " and the " 'evidence on which the court actually relied.' " (*Armstrong*, *supra*, 1 Cal.5th at p. 451.) The trial court did not base its ruling on this issue. To the contrary, the court expressly concluded that Juror No. 10's inability to continue deliberating was "based upon, not so much the [extrinsic] information but the . . . way in which it was presented to her." Further, the record is unclear whether Juror No. 10 would have been unwilling to follow an instruction from the court (rather than the foreman) to disregard the extrinsic evidence. The court admonished the other jurors to disregard the evidence, and they confirmed that they would do so. The court did not admonish Juror No. 10.

The People contend that, when Juror No. 10 left the jury room and waited in the witness room, she demonstrated that she was emotionally unable to continue deliberating by separating herself from the jury. The trial court did not cite this prior to dismissing her. Later, however, when ruling

11

on Jones's motion for a mistrial, the court stated that Juror No. 10 demonstrated her inability or unwillingness to deliberate when she "physically removed herself from the jury room and refused to return." We conclude this finding is unsupported by the record. Juror No. 10 left the jury room during a break to inform the court of the problem and was not the only juror to leave. After telling court staff that she wanted to report juror misconduct, she waited in the courtroom for the judge to return from lunch. The court then ordered the jury not to resume deliberations until further notice while it conducted its inquiry. After Juror No. 10 testified, the court itself, not Juror No. 10, suggested that she wait in the witness room rather than the jury room.[1] The court then dismissed her before allowing deliberations to resume. The record does not demonstrate Juror 10 ever refused to rejoin the jury for deliberations. (See *Armstrong, supra,* 1 Cal.5th at p. 452 [record overall did not manifestly support discharging juror for separating herself from jury by reading book and cell phone during deliberations].)

The People point to other facts occurring after the court dismissed Juror No. 10, but these cannot support a decision the court had already made. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 716 [trial court's decision must be evaluated based upon the evidence before the court when it ruled].)

Finally, our dissenting colleague's deferential approach does not meet the more rigorous demonstrable reality standard. (See *Armstrong, supra,* 1 Cal.5th at pp. 450-451.) The dissenting opinion applies a standard closer to

---

[1] At the end of Juror No. 10's testimony, the court said, "Would you do me a favor, . . . if you would be kind enough, I believe you feel more comfortable just waiting in the jury room," and she responded, "If you don't mind." The court then said, "I'm sorry. In the witness room," and Juror No. 10 said "Yes."

12

the substantial evidence test, citing evidence that could support the court's decision, minimizing or omitting the parts of the record that undercut the court's reasoning, and liberally drawing on inferences to explain the court's failure to solve the ambiguity at the heart of this appeal: Was Juror No. 10 unwilling or unable to deliberate, or would it simply have been "very difficult"? That ambiguity "was never resolved by proof" sufficient to give us confidence that Juror 10 was properly discharged. (*Compton, supra*, 6 Cal.3d at p. 60; *Armstrong, supra*, 1 Cal.5th at p. 452 [evidence did not manifestly support discharging juror for failure to deliberate, despite some supporting evidence].)

Although we are sympathetic to the quandary facing the trial judge in these circumstances, the record simply does not support, as a demonstrable reality, a conclusion that Juror No. 10 was unable or unwilling to continue deliberating. The error is prejudicial and requires reversal of the judgment. (*Armstrong, supra*, 1 Cal.5th at p. 454; *Cleveland, supra*, 25 Cal.4th at p. 486.)

## DISPOSITION

The judgment is reversed in its entirety. The double jeopardy clauses of the California and federal Constitutions do not bar retrial of the case. (*Armstrong, supra*, 1 Cal.5th at p. 460.)

13

_____
BURNS, J.

I CONCUR:


_____
JONES, P.J.

A155720

Needham, J., Dissenting

Contrary to the majority opinion's assertion, this case is not about a trial court's decision to remove a potential "hold out" juror in a murder case. (Maj. Opn., at p. 1.)  The jury had not been deliberating long, apparently no vote had been taken, and while Juror No. 10 expressed having had "problems" with a couple of the elements of one charge, she confessed before her removal that she was unable to disregard excluded evidence of the appellant's prior drunk driving conviction—thus clinging to ill-gotten information that undermined the appellant's defense.  This appeal, more accurately, is about the dismissal of a juror who expressed such a telling combination of inadequacies that no one in the courtroom suggested she was fit to continue deliberating, and only now, long after appellant's conviction, does his lawyer venture that Juror No. 10 should have been forced to stay on the jury after all.

In my view, the majority opinion elevates the demonstrable evidence standard to a daunting new height.  And while it may be worth encouraging trial judges in future cases to create a record that includes the words now insisted upon by the majority opinion, that lesson could easily be imparted without championing hindsight at the expense of justice for the parties in this case.  I respectfully dissent.

A.  Applicable Legal Standard

Under Penal Code section 1089, a trial court has discretion to discharge a juror who is no longer able or willing to deliberate.  On review, we determine whether the stated basis for the discharge was a "demonstrable reality"—that is, whether the court's conclusion was "manifestly supported" by the evidence on which the court actually relied.  (*People v. Armstrong*

1

(2016) 1 Cal.5th 432, 450-451 (*Armstrong*); *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053 (*Barnwell).)*

It is critical to remember, however, that while the demonstrable reality test protects important due process and jury trial rights of the defendant, it does not abandon every fundamental principle that has long governed appellate review of determinations by a trial judge. To the contrary, our Supreme Court has explicitly preserved several principles relevant here.

First, like the substantial evidence test, the demonstrable reality test does not allow us to reweigh the evidence. (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.) Accordingly, the question is not whether there was such a high degree of proof that every trier of fact would agree Juror No. 10 was unable or unwilling to deliberate—or even that we would agree—but merely that the court's conclusion finds clear "support" in the evidence it cited.

Second, we evaluate whether the court's conclusion is supported by the cited evidence "in light of the entire record." (*Barnwell*, *supra*, 41 Cal.4th at pp. 1052-1053, italics added; see *Armstrong*, *supra*, 1 Cal.5th at p. 451 ["based on our examination of the record as a whole"].) So while we look to the trial court's reasoning and the evidence it cited, we do not close our eyes to the rest of the record in determining if the cited evidence manifestly supports the court's conclusion. The context of the ruling is important.

Third, we defer to the trial court's credibility findings and factual determinations, recognizing it is the trial judge who observed the jurors and their demeanor. (*Barnwell*, *supra*, 41 Cal.4th at p. 1053 [judge may make determinations based on judge's personal observations of what transpired, and those factual determinations are given deference because they are premised on "firsthand observations unavailable to us on appeal"]; *People v. Lomax* (2010) 49 Cal.4th 530, 590.) Indeed, we may draw inferences from the

2

court's statements to decide that its conclusion is manifestly supported. (*Barnwell*, *supra*, 41 Cal.4th at p. 1053 [although court "did not expressly state" that it disbelieved a juror's disclaimer of bias, the "clear thrust of the court's ruling" was that it found other jurors' reports credible and "based its decision on that finding," thus establishing a demonstrable reality with the "totality of the evidence" supporting the court's "evident conclusion"].)

The majority opinion charges me with applying a "standard closer to the substantial evidence test" and misstates my analysis. (Maj. Opn., at pp. 13-14.) The criticism is bewildering, since the standard I apply comes from the very words our Supreme Court used in defining the test of demonstrable evidence. While the demonstrable evidence test is "*less* deferential" (italics added) than the substantial evidence test, and looks to the facts on which the trial court based its ruling, it does not abandon all deference or compel independent review by appellate justices who have nothing but the cold record to read. (*Barnwell*, *supra*, 41 Cal.4th at pp. 1052-1053; *Armstrong*, *supra*, 1 Cal.5th at p. 450.)

B. Application of the Demonstrable Reality Test

Our first task, then, is to ascertain the court's reason for discharging Juror No. 10 and the evidence on which the court relied. Initially, the judge indicated his inclination to discharge Juror No. 10 because she "clearly" expressed an inability to continue deliberating in light of the prejudicial information she learned—that the defendant had been convicted previously for driving under the influence—as well as how that information was presented to her and her perception that she was being "bullied.[1]

---

[1] While the judge said Juror No. 10 used the term "bullying," the reporter's transcript indicates she used the words, "somewhat coerced."

At the time the trial judge discharged Juror No. 10, he provided a broader explanation for his conclusion, asserting it was "based on the information you provided to the Court, especially as pertains to your expressing an inability to continue to deliberate in this case based upon how all this transpired." (Italics added.) This "information [Juror No. 10] provided to the Court" included several salient facts: (1) Juror No. 10 was "extremely upset" and "felt somewhat coerced" in the way Juror No. 9 told her, "with attitude," that the defendant had a prior drunk driving conviction that was not in evidence; (2) she was "unable" to "strike from the record" the information about the defendant's prior conviction; (3) it would be very difficult for her to continue deliberating in light of the information she received, the context in which she received it, the impression she had as to why it was brought up, and the way it was stated; and (4) she had not returned to the jury room since the lunch break and would be more comfortable staying in the witness room while the court resolved the matter (which, as the judge expressed the next court day, indicated to the judge an inability or refusal to continue deliberating). [2]

Obtained personally by the judge in his face-to-face interview of Juror No. 10, this evidence—reflecting her mental state, difficulty continuing, and

Under the circumstances here, being "somewhat coerced" into a verdict would have been as bad as (or worse than) being bullied.

[2] A refusal or inability to deliberate is an unwillingness to engage in the deliberative process, as shown by, e.g., a juror expressing a fixed conclusion at the start of deliberations and refusing to consider other points of view, refusing to talk to other jurors, or trying to separate physically from other jurors. (*People v. Cleveland* (2001) 25 Cal.4th 466, 485.) This list is not exclusive, however, and an inability or unwillingness to deliberate may be demonstrated by other evidence. (*Ibid.*)

4

inability to disregard prejudicial extrinsic information—"manifestly supported" the court's conclusion that Juror No. 10 was unable to deliberate. In fact, I find the conclusion inescapable. And whether or not every judge would have made the same call, certainly the court's conclusion was reasonable, clearly supported, and well within its discretion.

The majority points out that Juror No. 10 did not explicitly say she was "unwilling" or "unable" to continue deliberating. (Maj. Opn., at p. 9.) There is, however, no requirement in Penal Code section 1089 or the case law that a juror, who tells a judge that she is "extremely upset", feels "somewhat coerced", is unable to ignore prejudicial evidence that never should have been brought into the jury room, and concurs it would be very difficult for her to continue deliberating, must additionally utter the magic words "I am unwilling or unable to continue deliberating" before the judge can draw that conclusion from what the juror did say and how she said it. A trial judge, as a fact-finder, draws inferences from the evidence, and the demonstrable reality test does not strip the judge of this historic duty. Nor is there such a great chasm between "very difficult" and "unable" that it cannot be bridged by all of the other evidence on which the court here relied.

The majority opinion further notes that Juror No. 10 did not specifically ask to be discharged (Maj. Opn., at p. 9), but this too is not required. Penal Code section 1089 distinguishes instances in which, as here, a juror is "unable to perform his or her duty" and instances in which a juror "requests a discharge." The key in this case is that the evidence referenced by the court, in its totality, clearly supported the conclusion that Juror No. 10 could no longer perform the duty of a juror. (See *People v. Diaz* (2002) 95 Cal.App.4th 695, 701-704 (*Diaz*) [affirming judge's removal of juror based on

5

judge's inquiry, observation of the jury, and credibility determination, even though juror said she could weigh the evidence].)

The majority opinion's reliance on *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1854-1856 is misplaced. There, after deliberating more than three days, two jurors told the judge their employers would not compensate them for further jury service and asked the court to help them persuade their employers to do so. Although the jurors never asked to be discharged or expressed unwillingness to continue their service, and "no inquiry of any kind was made" by the court, the court removed the jurors over defense counsel's objection. Here, by contrast, Juror No. 10 admitted that continuing as a juror would be "very difficult" in light of the information she learned and the manner in which it was conveyed. Based on nothing more than the statements to which the court referred when discharging Juror No. 10, the demonstrable evidence standard was met.

But there is more: the record contains important clues that provide context and inform our evaluation of the evidence cited by the court. (See *Barnwell*, *supra*, 41 Cal.4th at pp. 1052-1053.)

Preliminarily, the record shows that the judge knew what he was doing in handling Juror No. 10 and the situation precipitated by Juror No. 9. (*Barnwell*, *supra*, 41 Cal.4th at p. 1052 [court should exercise its "broad discretion" to remove a juror "with great care"].) He spotted the issues, inquired of counsel how they wanted to proceed, repeatedly conferred with counsel in sidebars, interviewed each juror separately, determined that all jurors could disregard the prior conviction (except Juror No. 10), allowed counsel to make arguments, remained mindful of the record, issued rulings, and stated his reasons. The court's care in addressing the matter overall

6

suggests that its decision not to inquire further of Juror No. 10 was for a good reason, as opposed to whimsy or neglect.

That good reason is reflected in the record as well. After a sidebar with counsel, the court had a further discussion with Juror No. 10 and said, "I can't tell you right at this moment what I'm going to do, but for your own personal wellbeing, I don't think you're going to have to concern yourself with engaging in this any further." (Italics added.) The court later observed that Juror No. 10 may have been an "eggshell juror" in her reaction to Juror No. 9's improper disclosure of information. From this it is plain that the court found Juror No. 10 credible and believed her assertions of difficulty and feeling coerced—a determination to which we defer. (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.) It also suggests that for court and counsel who heard and saw Juror No. 10, there was something noteworthy to observe.

Most importantly, after observing Juror No. 10, neither the prosecutor nor the defense ever argued that Juror No. 10 should have been asked more questions, let alone that she was willing and able to deliberate. Although at one point defense counsel objected to Juror No. 10 being released, that was because—as counsel later made clear at the hearing—he felt it unfair to deal with the situation by merely releasing Juror No. 10 (who might have been leaning toward the defense) and not the rest of the jury, urging that the only proper solution was to declare a mistrial. Counsel never said Juror No. 10 was able to continue as a fair and impartial juror.

Given the magnitude of the evidence, the care with which the court handled its task, the record as a whole, and the absence of any argument from anyone that Juror No. 10 could remain on the jury, there is to me a clear inference: the people who not only knew what Juror No. 10 said, but also saw and heard her say it, concluded she was unable to continue deliberating.

7

That is why the judge did not ask her further questions, why the defense never asked for further inquiry, and why none was needed. Simply put, to the trial judge and to trial counsel—who were actually there—Juror No. 10's discharge was "manifestly supported" by the evidence. I think so too.

   C. The Majority's Concerns About the Record are Misplaced

The majority opinion declines to consider the fact that Juror No. 10 told the judge she was unable to follow the foreperson's direction to "strike" the revelation of the defendant's prior conviction, because the judge did not mention it when announcing his ruling. (Maj. Opn., at p. 11.) I disagree. Juror No. 10's indication that she was unable to disregard the prior conviction was part of the "information [she] provided" to the court, which the judge expressly said he relied upon when discharging her.

Next, the majority opinion disregards the judge's observation that Juror No. 10 "physically removed herself from the jury room and refused to return," on the ground the observation is not supported by the record. (Maj. Opn., at p. 12.)[3] In my view, however, the record amply supports the judge's statement. Juror No. 10 left the jury room when a break was called right after Juror No. 9 made her improper disclosure, bypassed the lunch that the jurors were "waiting for," sat in the courtroom alone until the judge was alerted and began to interview her in the presence of counsel, accepted the court's invitation to wait in the witness room, and never returned to the deliberation room. Indeed, defense counsel agreed with the court's

---

[3] The judge made this observation on the first court day after discharging Juror No. 10. It is therefore part of the record of the judge's reasoning and must be considered. (See *Diaz*, supra, 95 Cal.App.4th at p. 702 [considering judge's explanation for removing a juror, which he stated at a subsequent hearing on a new trial motion].)

observation that Juror No. 10 refused to return to the jury room, stating: "We've got to make sure that the record is clear that [Juror No. 10] refused to go back in the deliberation room because she was being intimidated by Juror No. 9 and the other jurors. (Italics added.)

The majority opinion counters that Juror No. 10 did not literally "refuse" to deliberate, because the court dismissed her before allowing deliberations to continue. (Maj. Opn., at p. 12.) But a juror's acknowledgement that she would feel better if she sat in a witness room rather than returning to the room where the other jurors were stationed is telling. Ultimately, whether we say Juror No. 10 "refused" to return to the jury room or just felt more comfortable not returning to the jury room, the point is that this evidence—with all the other evidence relied on by the court—manifestly supported the conclusion that Juror No. 10 was unwilling or unable to continue to deliberate.

The majority opinion characterizes the dismissal of Juror No. 10 as problematic because she said she was "having problems" with the elements for the murder charges, and virtually any juror whose views differ from those of other jurors may feel "somewhat coerced" or find the deliberation process "very difficult." (Maj. Opn., at pp. 10-11, citing *People v. Johnson* (1992) 3 Cal.4th 1183, 1255.) However, the point in Johnson was that, given the often harsh nature of deliberations generally, the trial judge did not have to inquire into potential coercive conduct by a purported offending juror (like Juror No. 9, whose dismissal is not at issue here), in light of the risk that the court's inquiry would unduly probe into the substance of the deliberations. (*Id*. at p. 1255.) The case did not address the question here: whether there was good cause to dismiss a juror so offended by another juror's conduct that she cannot get the inadmissible prejudicial evidence out of her mind and

9

finds it very difficult to continue.  In contrast to Johnson, the court here did not discharge Juror No. 10 merely because she found deliberations difficult, but also because Juror No. 10 expressed an inability to ignore improper information prejudicial to the defense.

> D.     The Availability of Other Questions Is Immaterial

The majority opinion points out that the trial judge did not ask Juror No. 10 directly whether she "could" continue deliberations, but instead asked her if it would be "very difficult" for her to continue.  (Maj. Opn., at p. 9.) Similarly, the majority concludes, Juror No. 10's indication that it would be "very difficult" to continue was equivocal and the court should have probed what she meant.  (Maj. Opn., at p. 9.)

The trial judge's inquiry into a juror's ability to serve need only be reasonable, and its scope and manner are left to the judge's discretion.  (See, e.g., *People v. Engelman* (2002) 28 Cal.4th 436, 442.)  The judge has no obligation to ask explicitly the ultimate question—here, whether Juror No. 10 was "unable" to continue deliberating—in every case.  Nor is the issue whether any of us on this appellate panel would have asked that question before ruling, or whether asking such a question might make a clear record clearer or even be indispensable in another case.  (See *People v. Beeler* (1995) 9 Cal.4th 953, 989 [although a more detailed inquiry by the court might have assisted the appellate court, "such inquiry is preferred, [but] it is not required"].)  In light of the evidence the judge cited and the absence of any request to ask the question, no abuse of discretion has been shown.

The majority opinion also states that further inquiry of Juror No. 10 might have resolved her concerns about the revelation of the defendant's prior conviction and about Juror No. 9.  (Maj. Opn., at p. 9.)  But that is speculative, and I find nothing in the record to conclude that the inquiry was

10

needed under the circumstances.  As to Juror No. 10's concerns about the defendant's prior conviction, Juror No. 10 had already explained that she was shocked at the defendant's prior conviction and was unable to ignore that information.  As to potentially asking Juror No. 10 if she would be able to deliberate if she knew Juror No. 9 would no longer be on the jury, the record suggests her concern went far beyond Juror No. 9.  In fact, during the hearing on his mistrial motion, defense counsel acknowledged that Juror No. 10 felt intimidated not only by Juror No. 9, but by the rest of the jury as well: "We've got to make sure that the record is clear that [Juror No. 10] refused to go back in the deliberation room because she was being intimidated by Juror No. 9 and the other jurors.  That's how she felt about it.  It wasn't like they were engaging in proper discussions.  Sounds like, it sounded like they were trying to persuade her to change her mind by using illegal tactics and by using information that this Court has deemed prejudicial and inadmissible." (Italics added.)

The majority opinion says the record is unclear whether Juror No. 10 would have been unwilling to disregard the prejudicial evidence if instructed to do so by the judge rather than the foreperson.  (Maj. Opn., at p. 11.)  To the contrary, I find the record quite clear.  Juror No. 10 already knew that the jury was not supposed to consider extrinsic information—indeed, that was part of her concern—so she was already well-informed of the court's instruction.  Moreover, she expressed an inability to set aside the prejudicial information no matter who told her to do so.  She told the judge that the foreperson said, " 'Just strike that from the record.' "  Then she informed the court: "Well, I'm unable to do that, Your Honor."  (Italics added.)  Her statement was far more thans a refusal to go along with a suggestion by the foreperson; it was an unqualified confession that she could not put out of her

11

mind the excluded prejudicial evidence that the defense had tried so hard to keep out.

The cases on which the majority relies for its concern about the judge's inquiry are readily distinguishable.  In *People v. Burgener* (1986) 41 Cal.3d 505, overruled on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753, the trial court erred in failing to remove a juror where it was notified that the juror might have been intoxicated during deliberations but did not even discuss the matter with that juror, thus failing to conduct a sufficient inquiry.  (*Id*. at pp. 519-521.)  Here, by contrast, the court interviewed Juror No. 10 at length.

In *Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, two jurors complained that Juror No. 7 adamantly expressed her opinion and failed to listen well.  The court interviewed only those two jurors, assumed that Juror No. 7 had made up her mind because she closed her eyes during closing argument, and discharged her.  The court of appeal reversed, remarking that the judge should have at least interviewed Juror No. 7 and the foreperson.  (*Id*. at pp. 551-557.)  Here, the court interviewed Juror No. 10 (and all the other jurors) before discharging her.

In *People v. Allen and Johnson* (2011) 53 Cal.4th 60, it was not entirely clear what a juror meant when he said he thought the prosecution had no case when the prosecutor rested, the court did not ask him to explain the statement, the juror denied making up his mind before deliberations began, and there was evidence that the juror had in fact participated in deliberations and voted "undecided."  This evidence was held insufficient to remove the juror.  (*Id*. at pp. 72-75.)  Here, by contrast, the court did not rely on the opinions of other jurors but on the words of Juror No. 10 herself, who never claimed she could continue to deliberate.

12

In *People v. Compton* (1971) 6 Cal.3d 55, a juror stated to his barber that he did not like to be on the case because it was hard to keep an open mind.  Although the trial judge "recognized" that the juror's remark was equivocal, he did not question the juror about the statement.  And even though the judge decided that the remark did not show an inability to serve, he discharged the juror anyway out of an abundance of caution.  (*Id.* at pp. 59-60.)  The appellate court reversed because the ambiguity in the juror's remark was "not resolved by proof" and the judge was not entitled to merely "presume[e] the worst."  (*Id.* at p. 60.)  Here, any ambiguity in Juror No. 10's agreement that it would be "very difficult" to continue deliberating was resolved by proof: her statements that she was "extremely upset," felt "coerced," and was "unable" to disregard the excluded prejudicial evidence.

In *People v. Goldberg* (1984) 161 Cal.App.3d 170, a juror became upset and asked to be excused after another juror improperly referred to a news article during deliberations.  The court acted within its discretion in declining to discharge the juror because, after the judge conferred with the juror, she said she could continue on the jury uninfluenced.  (*Id.* at pp. 191-192.)  Unlike the juror in *Goldberg*, however, Juror No. 10 never said she could continue to deliberate.  And while the appellate court in *Goldberg* recounted the judge's statements to the juror, its purpose in doing so was descriptive, not prescriptive; *Goldberg* does not hold that it would be an abuse of discretion for a judge in a different case to conduct a different inquiry.[4]

---

[4] The majority opinion also cites *People v. Bennett* (2009) 45 Cal.4th 577.  There, the court found that the trial judge's decision not to remove a juror was within his discretion where the juror had expressed that, while difficult, he could verbally affirm his verdict in open court if he had to.  (*Id.* at pp. 621-623.)  Juror No. 10 made no such affirmation.

All of these cases are distinguishable because they dealt with instances in which a trial judge ruled without addressing the key issue with the juror whose ability to deliberate was in question. Moreover, in most of the cases, the issue was whether the trial judge could rely on information supplied by other jurors to remove a juror who wanted to remain and who professed an ability to deliberate. Here, by contrast, the issue is whether the juror herself expressed facts clearly supporting the conclusion that she was not able or willing to deliberate further. A juror's unchallenged and credible expression of her own difficulties in continuing deliberation would typically be of greater weight than the mere speculations of other jurors. (See, e.g., *People v. Samuels* (2005) 36 Cal.4th 96, 131–133 [discharge of juror upheld where the juror was distressed, told the court she could not consider imposition of the death penalty, and lacked courage to act on an obligation to do so if appropriate]; *Diaz*, *supra*, 95 CalApp.4th at pp. 702-704 [within court's discretion to discharge a juror who initially said she was having difficulty in the jury room, cried, and said other jurors were "bombarding" her, even though she later recanted, in light of the court's credibility call after inquiry and observation of her expression, tone, and manner].)

When it comes down to it, the discharge of Juror No. 10 was the clearly prudent decision, or at the very least within the trial court's broad discretion. To reverse the conviction because the judge did not employ the best words to convey the obvious is not consonant with appellate review or justice. And while the demonstrable reality test "reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury" (*Barnwell*, *supra*, 41 Cal.4th at p. 1052), it is an odd result indeed that the majority opinion would place the defendant's fate in the hands of a juror who by all accounts felt coerced and was no longer unbiased.

14

In sum, the judge in this case conducted an inquiry within the scope of his discretion, and he relied on evidence that provided manifest—if not overwhelming—support for removing Juror No. 10 in light of the entire record. Appellant's argument as to the removal of Juror No. 10 should therefore be rejected, and we should consider the other issues appellant has raised in his opening brief.

NEEDHAM, J.

A155720

15

Alameda County Superior Court, Case No. H58702, Hon. Paul Delucchi

Michael Goldrosen for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance W. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Andrew Hamilton Smith, Deputy Attorney General, and Bruce Slavin, Deputy Attorney General, for Plaintiff and Respondent.